**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
-----------------------------------------------------------X
HARINI REDDY,                            :
                                         :   Civil Action No.: 2:22-cv-02689-CMR
                            Plaintiff,   :
                                         :
             v.                          :
                                         :
UNIVERSITY OF PENNSYLVANIA,              :
                                         :
                            Defendants.  :
-----------------------------------------------------------X
```

## COMPLAINT AND JURY DEMAND

Plaintiff Harini Reddy ("Plaintiff") by her attorneys Nesenoff & Miltenberg, LLP and Summers, McDonnell, Hudock, Guthrie & Rauch, P.C, as and for her complaint against Defendant University of Pennsylvania ("UPenn" or the "University"), respectfully alleges as follows:

## THE NATURE OF THE ACTION

1.      This action arises out of the intentional, willful, and wanton retaliation and discrimination that Plaintiff has experienced at the hands of Defendant UPenn, which ultimately resulted in Plaintiff's wrongful suspension from the UPenn pre-med focused post-baccalaureate program[1].

2.      As the only South Asian female in her post-baccalaureate program, Plaintiff quickly became the target of microaggressions and discrimination throughout her time in the program.

3.      Plaintiff complained of the discriminatory mocking that she experienced from both students and professors to mandatory reporters at the University. However, the University failed to take *any* action to prevent or remedy the discrimination to which Plaintiff was subjected.

---

[1] A post-baccalaureate program begins after the completion of an undergraduate degree and is designed to support transition to professional school.

4.      After being isolated and demeaned by her chemistry professor, Plaintiff expressed to the professor that she felt he was demonstrating racial biases against her. However, Plaintiff's complaints again went unaddressed.

5.      After Plaintiff expressed this concern, her chemistry professor responded by reporting Plaintiff to the University for an alleged academic integrity violation, prompting a full-fledged, sloppy, and biased investigation.

6.      Despite available overwhelming exculpatory evidence that two other students had colluded and fabricated their stories to frame Plaintiff, the University refused to seek out or consider evidence showing Plaintiff's innocence.

7.      As a result of UPenn's unlawful conduct and slanted investigation, Plaintiff has been found responsible for an academic integrity violation and sanctioned to a one and one-half year suspension from the University.

8.      As a result of Defendant's unlawful conduct, Plaintiff's reputation has been damaged, her future educational and career plans have been completely derailed, and Plaintiff will be unable to attend a U.S. medical school and pursue her career as a doctor.

9.      Plaintiff has sustained damages, including but not limited to past and future economic losses, reputational harm, and diminished/lost future educational and career prospects.

10.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## THE PARTIES

11.     Plaintiff is a natural person and a resident of Pennsylvania. During the events described herein, Plaintiff was enrolled as a full-time, tuition-paying, post-baccalaureate student at UPenn.

12.     Defendant UPenn is a partially federally funded private university located in

Philadelphia, Pennsylvania, where it maintains its principal offices and place of business.

## JURISDICTION AND VENUE

13.　　This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; and (iii) the state law claims are so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

14.　　This Court has personal jurisdiction over Defendant UPenn on the ground that it is conducting business within the State of Pennsylvania.

15.　　Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.　　UPENN ISOLATES PLAINTIFF DUE TO HER ETHNIC BACKGROUND**

**A.　　Plaintiff's Background**

16.　　Plaintiff has long been an outstanding student, excelling academically since high school, where she graduated with honors and a 5.525 GPA.

17.　　Plaintiff then attended a top university from 2010 to 2014, where she received her degree in psychology and conducted data collection and population health research at a renowned cancer center.

18.　　Since 2015, Plaintiff has worked as a social worker, and has contributed to multiple public health and restorative justice projects through the City of Philadelphia.

19.　　Plaintiff subsequently attended another top university from 2015 to 2017 and received her Master of Social Science.

20.    Due to her outstanding academic performance while pursuing her master's degree, Plaintiff was selected to receive a fellowship reserved for the top performing students.

21.    Plaintiff matriculated to UPenn in May of 2020, and enrolled in the University's Pre-Med Post-Baccalaureate Program, with intentions to subsequently attend medical school.

22.    Plaintiff had a projected completion date of the program of Spring 2021, at which point Plaintiff was to receive a certificate from the program and would have all prerequisite courses completed to apply to medical school.

23.    Given her extensive academic record and her plans to attend medical school, Plaintiff has held herself to the highest standards of personal and academic integrity.

24.    Plaintiff is currently studying for the MCAT and had plans of applying to medical school within the next cycle.

**B.    Plaintiff's Chemistry Lab Professor Retaliates Against Plaintiff for Discrimination Complaints and Accuses Her of Academic Misconduct**

25.    From the outset, Plaintiff has been subject to a hostile and discriminatory environment in her chemistry lab class and chemistry lecture course.

26.    Throughout the course, Professor Simon Tong ("Professor Tong") made the lab class more difficult for Plaintiff than for other students that were not of darker skin tone.

27.    In addition to a final lab report, the course required two "pre-labs" to be submitted during the semester in preparation for the final lab report. On each of the pre-labs, Professor Tong made clear that students in the course were permitted to collaborate with each other to complete the assignment.

28.    To complete the pre-labs, Plaintiff worked largely on her own, and occasionally discussed certain issues with another student, H.B., as permitted.

29.    Plaintiff never copied another student's work while completing her pre-lab

assignments.

30.    Plaintiff submitted the first pre-lab on April 8, 2021 and submitted the second pre-lab shortly thereafter.

31.    Plaintiff received exceptional grades on the pre-labs and encountered no issues regarding academic misconduct or any other disciplinary action.

32.    Plaintiff began working on her final Multistep Lab Report (the "Lab Report") on April 8, 2021, as it was a large assignment in the format of the American Chemical Society manuscript submission.

33.    The Lab Report was split into five sections: pre-lab one corresponded to parts one to three, while pre-lab two corresponded to parts four and five.

34.    By completing the pre-labs in a successful fashion, Plaintiff had the majority of information she needed to complete each individual section of the Lab Report.

35.    On April 17, 2021, during the time that Plaintiff was to complete her Lab Report, Plaintiff experienced discriminatory treatment from Professor Tong while completing a weekly quiz in her Chemistry course[2].

36.    The quiz opened on Friday, April 16, 2021, at 6 p.m. and closed on Saturday, April 17, 2021, at 6 p.m. Once the quiz is submitted, the quiz locks and cannot be reopened.

37.    Plaintiff completed the quiz on the afternoon of Saturday, April 17, 2021. Plaintiff's quiz closed at 1:23 p.m. due to the time limit imposed to take the quiz.

38.    After submitting the quiz, Plaintiff emailed Professor Tong on April 17, 2021, at 1:25 p.m., stating that she could not tell if her quiz pdf had been submitted online. Plaintiff attached her quiz pdf in the email so that Professor Tong could see that the quiz had been timely completed

---

[2] Professor Tong was the professor in both Plaintiff's chemistry lecture course and chemistry lab course.

on the afternoon of April 17, 2021, before 6 p.m.

39.     Professor Tong emailed Plaintiff back at 2:54 p.m. the same day, stating that he would reopen Plaintiff's quiz for submission purposes only, but that he was going to apply a late penalty on Plaintiff's quiz because he had to reopen the quiz, even though Plaintiff provided proof that her quiz was completed and timestamped.

40.     While Professor Tong was adamant about giving Plaintiff a late penalty, on information and belief, he consistently waived late penalties and granted extensions for white males in the class.

41.     Indeed, H.B., a white male in the class, received a number of extensions on his assignments without penalty and was even told that he could submit his lab reports at any time before the end of the semester without late penalty, regardless of the actual due dates.

42.     After emailing with Professor Tong for about four days regarding the late penalty, Professor Tong finally agreed to not apply the penalty.

43.     However, Professor Tong sent Plaintiff a punitive-toned email despite the fact that Plaintiff encountered a mere technical issue, asserting that Plaintiff must submit her quizzes on time and requiring a "confirmation that [Plaintiff] under[stood]" his email.

44.     On April 26, 2021, Plaintiff emailed Professor Tong requesting an extension of her Lab Report, given her workload in other classes and the tragic passing of another student in her class just the day prior.

45.     Professor Tong, however, stated that the Lab Report due date had already been extended, and that he was unwilling to provide a further extension to accommodate Plaintiff's needs.

46.     Plaintiff replied to Professor Tong's email, again requesting that the due date be

extended three more days given her demanding workload.

47.     Plaintiff felt that this was a reasonable request, given that on information and belief, Professor Tong had extended the due dates of assignments for other students, including H.B., for *weeks* after the initial due date.

48.     Incredibly, Professor Tong completely ignored Plaintiff's email and never responded, thereby again denying Plaintiff a reasonable extension.

49.     Professor Tong refused to accommodate Plaintiff's early extension request, but then extended the due date for the lab for all students after *other* students asked for an extension as well.

50.     Accordingly, Professor Tong was blatantly hostile to Plaintiff's extension requests, but more than willing to accommodate the extension requests of other students.

51.     On information and belief, Professor Tong would not grant Plaintiff's extension request due to her race, and only granted an extension to the class when other, non-minority, students joined in the request.

52.     On April 29, 2021, Plaintiff took another online quiz in her Chemistry course.

53.     After receiving an unsatisfactory grade on the quiz, Plaintiff emailed Professor Tong on May 2, 2021, requesting to discuss the grade.

54.     In her email, Plaintiff stated that Professor Tong's grading seemed punitive and that she felt Professor Tong was biasing himself against her as the only South Asian female in her cohort.

55.     Professor Tong, however, was unwilling to address the grading issues and instead insisted that Plaintiff deserved the poor grade that he had given.

56.     On April 26, 2021, Plaintiff began to work on the final version of her Lab Report

7

and created her Lab Report word document.

57.     While Plaintiff was in the process of completing her Lab Report, fellow classmate H.B. emailed Plaintiff with questions about the Lab Report assignment.

58.     On information and belief, another student, A.R., had been in communication with H.B. and asked him questions about the Lab Report. When H.B. did not know the answers to A.R.'s questions, H.B. contacted Plaintiff with the same questions on A.R.'s behalf.

59.     Plaintiff responded to H.B. the same day once she had completed her lab report and attached a copy of her completed Lab Report in order to provide H.B. with clarifications of his questions.

60.     Emailing H.B. a copy of Plaintiff's Lab Report was not against class policy as collaboration was permitted throughout the course.

61.     On information and belief, H.B. then sent Plaintiff's Lab Report to A.R., and A.R. used Plaintiff's Lab Report to complete her own Lab Report.

62.     A.R. then submitted her Lab Report in the evening on April 29, 2021.

63.     Plaintiff submitted her Lab Report the following day, on April 30, 2021. Plaintiff's Lab Report was completed the prior day, however Plaintiff waited until the due date to submit her Lab Report.

**C.     Plaintiff is Investigated for Academic Dishonesty**

64.     About two weeks later, on May 12, 2021, after Plaintiff had brought informal complaints of Professor Tong's own biases and discrimination to Professor Tong's attention via email, Plaintiff received a letter from Julie Nettleton ("Nettleton"), Director of the Office of Student Conduct ("OSC"), notifying Plaintiff that she had been accused of violating the University's Code of Academic Integrity (the "Notice Letter").

65.    The Notice Letter stated that Professor Tong alleged that on May 10, 2021, Plaintiff submitted a Lab Report that was substantially similar to another student's Lab Report.

66.    Notably, the Notice Letter contained the wrong date of the alleged incident, as Plaintiff had submitted her lab report weeks prior, on April 30, 2021.

67.    Moreover, the Notice Letter's vague allegation did not contain the name of the student to whom Plaintiff's Lab Report was allegedly similar.

68.    Without the name of the other student or the proper date of the assignment, Plaintiff was unable to ascertain exactly what assignment was being called into question, and accordingly, Plaintiff had no way of formulating a proper response.

69.    On information and belief, A.R. also received a Notice Letter from OSC on May 12, 2021.

70.    Upon receiving the notice, A.R. immediately texted H.B. and asked him to email Professor Tong and tell him that H.B. shared A.R.'s lab report with Plaintiff.

71.    A.R. also planned her response with H.B., stating that she would submit a screenshot of her current text conversation with H.B. as evidence to OSC to defend herself.

72.    On information and belief, A.R. and H.B. were involved in a romantic relationship and coordinated their stories and falsified evidence from the outset in order to defend A.R. and have Plaintiff found responsible for an academic integrity violation, even though in reality, A.R. had copied Plaintiff's report.

73.    That same day, Plaintiff contacted A.R. in an attempt to understand what had happened. However, A.R. refused to discuss the matter civilly with Plaintiff.

74.    Plaintiff subsequently met with Marcia Glickman ("Glickman"), Deputy Director of the OSC. Distressingly, Plaintiff was treated as a perpetrator from the outset.

75.     Glickman told Plaintiff that she saw that Plaintiff worked at a certain organization in Philadelphia as a social worker, and that she drove by the organization on her way home and got out of her car to see Plaintiff's name painted on a mural. On information and belief, Glickman went out of her way to see the mural and to "investigate" Plaintiff's background to see if she was telling the truth.

76.     Plaintiff then made a formal bias incident report on June 7, 2021, to the University to report the discrimination she had been subjected to in her courses.

77.     Plaintiff explained in her complaint that she and A.R., another minority female, had been accused of cheating, while H.B., a white male, was not, despite his involvement in the matter.

78.     Plaintiff met with the Vice Provost and the Director of the University's Women's Center and explained a number of the discriminatory incidents that she had experienced throughout the semester, but the meeting was ultimately cut short because the Vice Provost ran out of time.

79.     Despite Plaintiff's numerous requests to meet again, the Vice Provost and Director of the Women's Center consistently rescheduled the meeting, and ultimately no meeting to hear Plaintiff's full story occurred.

80.      As a result of the University's lack of follow up, Plaintiff had no support during the investigation, despite the fact that Plaintiff stated to the Vice Provost that she felt she was being subjected to discrimination and accused of cheating as a result of her race.

81.     Plaintiff received her official charge letter on July 9, 2021, a few weeks after her formal bias incident report, which charged her with an academic integrity violation.

82.     Plaintiff responded, requesting a hearing for the alleged violation, which was scheduled for August 26, 2021.

83.     On the morning of August 24, 2021, *two days* before the scheduled hearing,

Glickman and OSC added additional exhibits of evidence to the investigation file.

84.     The new exhibits consisted of screenshots of text messages between A.R. and H.B.

85.     Given the belated disclosure of the evidence and the fact that the hearing was scheduled for two days later, Plaintiff did not have an adequate opportunity to review and respond to the screenshots.

86.     In light of the new evidence, Plaintiff emailed Hearing Officer, Dan Kessler ("Kessler"), requesting a stay of the hearing in order to have more time to respond.

87.     Plaintiff also asserted that A.R. and H.B. provided screenshots of communications that had exculpatory messages deleted from the conversation and therefore were taken out of context, misleading, and fabricated.

88.     Given Plaintiff's concerns about the authenticity of the screenshots, Plaintiff also requested that the University allow her to present a forensic expert as a witness that could testify as to the authenticity of the text messages.

89.     Kessler inexplicably denied both of Plaintiff's requests but stated that the University *might* be willing to accept a written statement from a forensic expert at the hearing.

90.     Accordingly, Plaintiff again requested a stay of the hearing to allow reasonable time for her to get a written statement from the forensic expert.

91.     However, Kessler again denied Plaintiff's request for a stay, effectively denying Plaintiff the ability to present any statement from a forensic expert.

92.     Additionally, Plaintiff requested that the University obtain metadata of A.R.'s lab report to prove that her report was created and completed after Plaintiff's report.

93.     The University again denied Plaintiff's request to obtain exculpatory information and refused to obtain the metadata.

94.     Instead, the University proceeded on with the hearing on August 26, 2021, and the hearing was plagued with technical issues and procedural errors.

95.     By way of example, and not limitation, the witnesses were not sequestered as Plaintiff was promised prior to the hearing.

96.     Indeed, Professor Tong testified as a witness and then remained in the hearing room for the remainder of the hearing.

97.     Plaintiff was blindsided by the fact that she would subsequently have to testify in front of Professor Tong. Professor Tong's continued presence in the hearing room impaired Plaintiff's ability to fully present her side of the story at the hearing because Plaintiff did not want to offend Professor Tong due to his prominent position at the University and Plaintiff's desire to go to medical school.

98.     Additionally, there were numerous technical errors during the hearing which affected Plaintiff's ability to present her case.

99.     For example, Plaintiff's hearing was the first time that UPenn had ever held a "remote" hearing, where some members attended the hearing remotely and some attended in-person.

100.    The Hearing Panel had to stop witness testimony numerous times due to technical issues, which affected the ability to assess witness credibility.

101.    Moreover, the technical issues made Plaintiff extremely nervous and made it difficult for her to adequately present her story given the large number of pauses during her testimony.

102.    Following the hearing, the Hearing Panel found Plaintiff responsible for a violation of the Academic Integrity Code and recommended the sanction of a one and one-half year suspension, a transcript notation of the violation during the suspension, and an apology letter to A.R.

103.    A.R., who did not submit a formal bias report, was not found responsible for an

academic integrity violation.

104. Notably, the sanction did not take into account Plaintiff's spotless disciplinary record or her outstanding grades up until that point.

105. Plaintiff requested to review the hearing transcript and video prior to submitting her appeal. Nettleton agreed to allow Plaintiff to review the hearing transcript and video in-person, under Nettleton's supervision.

106. Plaintiff spent three days reviewing the hearing recordings. Throughout that time, Nettleton discouraged Plaintiff from reviewing the footage and again treated Plaintiff as a perpetrator.

107. For example, Nettleton said to Plaintiff that she did not know why Plaintiff was spending time viewing the footage because there was "nothing there."

108. Plaintiff submitted her appeal of the decision and sanction on September 28, 2021, in which she outlined numerous procedural issues and the disproportionality of the sanction.

109. The decision and sanction were upheld, however, by letter from Sophia Lee, Disciplinary Appellate Officer, on November 12, 2021.

110. Plaintiff has exhausted all avenues of appeal under UPenn's policies. This lawsuit represents Plaintiff's only hope to redress the wrongs occasioned by Defendant.

## II. <u>AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT UPENN</u>

111. Upon Plaintiff's matriculation to UPenn, Plaintiff and UPenn became mutually bound by the Charter of the University of Pennsylvania Student Disciplinary System ("the Policy"), which is the applicable policy for UPenn's disciplinary procedures, as well as the UPenn Policy on Equal Opportunity and Affirmative Action (the "Discrimination Policy") and the UPenn Policy Against Retaliation (the "Retaliation Policy") (collectively referred to as the "Policies").

112.    On information and belief, the Policy is updated and/or revised each new school year.

113.    The Policy and the various provisions contained therein are available online through the UPenn website.

114.    The Policy contains and represents a contract between students and the University and, in particular, between Plaintiff and Defendant UPenn.

115.    Throughout the investigation and adjudication in this case, Defendant breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policy and the processes set forth therein, and by permitting bias to infect and taint the proceedings.

116.    According to the Policy, "[w]hen a complaint is filed, the OSC promptly gives written notice of the complaint and its allegations to the student(s) alleged to have violated University rules. A copy of the Charter will be included with the notice, as well as a list of potential advisors who have received training from the OSC."

117.    The University breached the Policy because the Notice Letter that Plaintiff received contained a mere brief statement regarding the allegation and not the specific details regarding the assignment or the individuals involved. Moreover, the Notice Letter contained the incorrect date of the assignment.

118.    The Policy states, "[w]ithin a reasonable time before the hearing or any other time frame specified by the DHO, the OSC and the respondent(s) will exchange among themselves and with the DHO copies of all exhibits to be presented, the names of witnesses to be called, and a brief summary of the substance of testimony expected to be presented to the Hearing Panel."

119.    The University breached the Policy when additional exhibits were added to the

investigation file 48 hours before the hearing, which did not give Plaintiff a "reasonable time" to review and respond to the evidence.

120.    The Policy states, "[i]n exceptional circumstances, when a witness or exhibit does not become known or available until immediately before the hearing, the DHO may, at her or his discretion, permit the evidence to be presented or may reschedule the hearing to a later time."

121.    The University breached the Policy and abused discretion by failing to reschedule the hearing in light of the fact that new evidence had been submitted.

122.    Moreover, the University breached the Policy by failing to reschedule the hearing to allow Plaintiff to present exculpatory information in the form of a statement from a forensic expert.

123.    The Policy states, "[u]ntil there is a determination to the contrary by voluntary agreement to sanctions or by a Disciplinary Hearing Panel, there is a presumption that an accused student has not violated University rules, regulations, or policies."

124.    The University breached the Policy by presuming Plaintiff responsible from the outset and failing to afford Plaintiff the presumption of innocence.

125.    The Policy states that "[i]f a respondent or the OSC anticipates that a key witness will be unavailable for a hearing, they may ask the DHO to preserve the testimony of the witness on tape and present it as evidence at the hearing. The OSC and the respondent(s) must be notified in advance of the date, time and place of the taping."

126.    The University breached the Policy by failing to provide the option of taping the forensic expert witness that Plaintiff sought to provide at the hearing. Instead, the University refused to reschedule the hearing and took all steps to ensure that Plaintiff would not have the time to connect with a witness that would provide exculpatory information.

127.     According to the Policy, "[b]efore the Hearing Panel makes its recommendation on sanctions, it will review any previous disciplinary offenses by and sanctions against the respondent(s) and sanctions imposed in other similar cases."

128.     The University breached the Policy because Plaintiff's spotless disciplinary record and outstanding academic career were not properly taken into account when sanctioning Plaintiff to an unduly harsh one and one-half year suspension.

129.     The Retaliation Policy states that "Penn faculty, administrators, and staff shall not intimidate or take retaliatory action… against any member of the University community or a relative of such a person who is an employee or student at the University, who makes a report [of discrimination] in good faith and without malice."

130.     The University breached the Policy by permitting UPenn faculty to retaliate against Plaintiff after she brought forward complaints of discrimination. By way of example, and not limitation:

    a.    Professor Tong retaliated against Plaintiff by bringing a baseless academic integrity complaint against Plaintiff after Plaintiff complained to Professor Tong that he was exhibiting bias against her in grading her quizzes and lab assignments; and

    b.    The University retaliated against Plaintiff by taking adverse actions against Plaintiff in the investigation and adjudication of the complaint by subjecting her to a lengthy, unduly harsh suspension after she brought a formal complaint of discrimination to the University while the investigation was ongoing.

## III.     PLAINTIFF'S DAMAGES

131.     As a direct and proximate result of Defendant's improper conduct, an erroneous finding that Plaintiff engaged in academic dishonesty has been made a part of Plaintiff's transcript. The disclosure of the improperly stained disciplinary record will prevent Plaintiff from gaining acceptance to medical school or securing future employment.

132.    Plaintiff was falsely labeled as a perpetrator of academic dishonesty and was treated as guilty from the start; she was not given adequate opportunity to defend herself.

133.    Due to Defendant's improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of academic dishonesty, and the sanction is listed on Plaintiff's transcript.

134.    By improperly suspending Plaintiff and placing a notation on her transcript and disciplinary record, UPenn has damaged Plaintiff's future educational and career prospects. Specifically, as a result of UPenn's actions, Plaintiff will be forced to disclose and explain to medical schools and potential employers to which she may opt to apply that she was disciplined at UPenn for academic dishonesty.

135.    Given the seriousness of academic dishonesty violations, especially to someone in pursuit of a medical degree, schools and employers will extremely be unlikely to hire or admit someone who has been found responsible for academic dishonesty and sanctioned to a one and one-half year suspension.

136.    As a result, Plaintiff has suffered and will continue to suffer reputational damage, economic losses, and damages to her future educational and career prospects.

## AS AND FOR A FIRST CAUSE OF ACTION
### Violation of 42 U.S.C. § 2000d – Title VI Retaliation

137.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

138.    "To establish retaliation under Title VI, a plaintiff must show: (1) [she] was engaged in protected activity; (2) the funded entity subjected [her] to an adverse action after or contemporaneously with the protected activity; and (3) there is a causal link between the adverse action and the protected activity." *Lei Ke v. Drexel Univ.*, No. 11-6708, 2015 U.S. Dist. LEXIS

118211, at *120 (E.D. Pa. Sep. 4, 2015).

139.    Plaintiff engaged in a protected activity when she brought complaints of discrimination forward to Professor Tong, as well as when she brought a formal complaint of discrimination to the University during the investigation on June 7, 2021.

140.    Professor Tong subjected Plaintiff to an adverse action after she emailed him stating that she felt that Professor Tong was exhibiting bias against her as a South Asian student by bringing an academic integrity complaint against Plaintiff.

141.    There is a causal link between the protected activity and the adverse action because Professor Tong brought the academic integrity complaint against Plaintiff shortly after Plaintiff complained to him.

142.    Moreover, the University subjected Plaintiff to an adverse action when Plaintiff was found responsible for an academic integrity violation and sanctioned to a one and one-half year suspension after Plaintiff brought a formal bias incident report to the University on June 7, 2021.

143.    There is a causal link between the protected activity and the adverse action given the closeness in time between the bias incident report and the finding of responsibility.

144.    Moreover, there is a causal link between the protected activity and the adverse action because, on information and belief, A.R. was not found responsible and was not subjected to an unduly harsh sanction as Plaintiff was, despite being involved in the same incident, because A.R. did not make a bias report.

145.    Likewise, H.B., a white male, did not have an academic integrity complaint brought against him despite his involvement in sending Plaintiff's Lab Report.

146.    Additionally, following Plaintiff's bias incident report, the University refused to

seek out or allow exculpatory information, including but not limited to: (i) the metadata of A.R.'s lab report; and (ii) denying Plaintiff's forensic expert witness.

147.    On information and belief, Plaintiff was subjected to an unduly harsh sanction due to the bias incident report that she made during the investigation.

148.    As a result, Defendant UPenn intentionally, willfully, wantonly, and maliciously discriminated against Plaintiff in violation of Title VI.

149.    Accordingly, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to injunctive relief expunging Plaintiff's disciplinary record; removing any record of Plaintiff's suspension from her education file; destroying any and all records pertaining to the academic dishonesty matter; readmitting Plaintiff to UPenn as a student in good standing; amending Plaintiff's grades in her courses to reflect a proper grade on her Lab Report, quizzes, and assignments; and issuing Plaintiff her Post-Baccalaureate Pre-Health Core Studies Certificate.

## AS AND FOR A SECOND CAUSE OF ACTION
**Breach of Contract**

150.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

151.    At all times relevant hereto, a contractual relationship existed between UPenn and Plaintiff through UPenn's policies and procedures governing the student disciplinary system, including but not limited to the Policy, the Discrimination Policy, and the Retaliation Policy.

152.    In the Policies, UPenn makes express contractual commitments to its students involved in a disciplinary process.

153.    In addition to the express promises in the Policies, the contracts contain an implied covenant of good faith and fair dealing, which implicitly guaranteed that any proceedings would

be conducted with basic fairness.

154.    Defendant UPenn breached its express and/or implied agreements to Plaintiff throughout the disciplinary process. By way of example, and not limitation, Defendants breached the Policies by:

      a.     Failing to give Plaintiff proper notice of the allegations;

      b.     Failing to give Plaintiff proper notice and opportunity to review all evidence before the hearing;

      c.     Failing to postpone the hearing to give Plaintiff an opportunity to review evidence that the University added to the file 48 hours before the hearing;

      d.     Denying Plaintiff the opportunity to provide exculpatory witnesses, including a forensic expert;

      e.     Failing to provide Plaintiff with the presumption of innocence;

      f.     Failing to give Plaintiff the opportunity to submit a recording of unavailable witnesses;

      g.     Failing to properly take Plaintiff's spotless disciplinary record into account and giving Plaintiff an unduly harsh sanction under the facts of the case;

      h.     Allowing and fostering discrimination against Plaintiff throughout her time at UPenn;

      i.     Failing to remedy Plaintiff's complaints of discrimination; and

      j.     Retaliating against Plaintiff for bringing forth complaints of discrimination by investigating Plaintiff for a baseless academic integrity violation and finding her responsible.

155.    Plaintiff is therefore entitled to recover damages for Defendant UPenn's breach of the express and/or implied contractual obligations described above.

156.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, reputational harm, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

157.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)     on the first count for violation of Title VI Retaliation under 42 U.S.C. § 2000d, an injunction directing Defendant UPenn to: (i) expunge Plaintiff's disciplinary record; (ii) remove any record of Plaintiff's suspension from her education file; (iii) permanently destroy any record of the alleged violation against Plaintiff; (iv) permit Plaintiff to re-enroll at UPenn as a student in good standing; and (v) issuing Plaintiff her Post-Baccalaureate Pre-Health Core Studies Certificate; and (vi) amending Plaintiff's grades in her courses to reflect a proper grade on her Lab Report, quizzes, and assignments; (vii) plus damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    on the second count for state law breach of contract, a judgment against Defendant UPenn awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(iii)   awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all triable issues in the present matter.

**Dated:  New York, New York**
       **July 1, 2024**

                    **Respectfully submitted,**

                    **Nesenoff & Miltenberg LLP**
                    *Attorneys for Plaintiff*

By: /s/Andrew T. Miltenberg, Esq.
   Andrew T. Miltenberg, Esq., *pro hac vice pending*
   Stuart Bernstein, Esq., *pro hac vice pending*
   363 Seventh Avenue, 5th Floor
   New York, New York 10001
   212-736-4500 (telephone)
   212-736-2260 (fax)
   amiltenberg@nmllplaw.com
   sbernstein@nmllplaw.com

Summers, McDonnell, Hudock, Guthrie & Rauch, P.C,
*Attorneys for Plaintiff*

By: /s/Kevin Rauch, Esq.
   Kevin Rauch, Esq.
   Carrie McConnell, Esq.
   945 East Park Drive, Suite 201
   Harrisburg, Pennsylvania 17111
   717-901-5916 (telephone)
   krauch@summersmcdonnell.com
   cmcconnell@summersmcdonnell.com