**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **HARINI REDDY**<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**UNIVERSITY OF PENNSYLVANIA**<br><br>        **Defendant.** | **CIVIL ACTION NO. 22-2689** |

**MEMORANDUM OPINION**

**Rufe, J.**                                                                 **August 22, 2024**

Plaintiff Harini Reddy, a post-baccalaureate student, filed this lawsuit against Defendant University of Pennsylvania[1] alleging retaliation in violation of Title VI of the Civil Rights Act and breach of contract. The claims arise from the University's finding that Plaintiff was responsible for an academic integrity violation, resulting in a one-and-a-half year suspension. The University has moved to dismiss the Complaint for failure to state a claim. For the reasons set forth herein, Defendants' Motion to Dismiss will be granted in part and denied in part.

**I.     BACKGROUND**

The following facts, as alleged in the Complaint, are taken as true for purposes of deciding Defendant's Motion to Dismiss. Plaintiff was a full-time student enrolled in the University's post-baccalaureate program.[2] Post-baccalaureate programs are designed to support a transition to professional school (in Plaintiff's case, medical school) after the completion of an

---

[1] As Defendant notes in its briefings, the Complaint names the "University of Pennsylvania" rather than the Trustees of the University of Pennsylvania. Def.'s Mem. Law Supp. Mot. Dismiss at 1 n.1 [Doc. No. 16-2]. For purposes of clarity, the Court refers to Defendant as "the University" in this Opinion.

[2] Compl. ¶ 11 [Doc. No. 30].

undergraduate degree.[3] Before enrolling in the program in May 2020, Plaintiff received a degree in psychology, completed her master's degree, and was employed as a social worker.[4]

Plaintiff was the only South Asian woman in her program.[5] She alleges that Professor Simon Tong, her instructor in her chemistry lab and lecture, made the classes more difficult for her compared to other students who were not of darker skin tone.[6] For example, Plaintiff alleges that Professor Tong was reluctant to waive a late penalty for one online quiz that Plaintiff submitted, but consistently waived late penalties and granted extensions for white men, including H.B., who was informed that he could submit his reports at any time before the end of the semester without a late penalty.[7] As another example, when Plaintiff requested a three-day extension to submit her final Lab Report due to her workload in other classes and the recent, tragic death of a classmate, Professor Tong replied that the due date had already been extended and that he was unwilling to grant a further extension.[8] It was only after other students made similar requests that Professor Tong extended the due date for all students.[9]

On the same day that she sent her email requesting a three-day extension, Plaintiff began work on the final version of her Lab Report.[10] Under class policy, collaboration was permitted throughout the course.[11] H.B. sent Plaintiff questions about the assignment from A.R., a minority

---

[3] *Id.* ¶¶ 1 n.1, 21.

[4] *Id.* ¶¶ 17–19, 21.

[5] *Id.* ¶ 2.

[6] *Id.* ¶ 26.

[7] *Id.* ¶¶ 36–43, 47.

[8] *Id.* ¶¶ 44–45.

[9] *Id.* ¶¶ 49, 51.

[10] *Id.* ¶ 56.

[11] *Id.* ¶ 60.

female classmate with whom he had a relationship.[12] In response, Plaintiff sent H.B. her completed Lab Report, which H.B. forwarded to A.R.[13] After using Plaintiff's work product, A.R. submitted her Lab Report on the evening of April 29, 2021.[14] Plaintiff submitted her Lab Report on April 30, 2021, even though she had completed it the day before.[15]

On May 2, 2021, Plaintiff emailed Professor Tong asking to discuss a low grade she had received on an online quiz.[16] In the same email, Plaintiff raised that Professor Tong's grading appeared punitive and he seemed biased against her as the only South Asian woman in her cohort.[17] Professor Tong responded only that Plaintiff deserved the poor grade.[18] On May 12, 2021, Plaintiff received a letter from Julie Nettleton, Director of the Office of Student Conduct ("OSC"), notifying Plaintiff that she had been accused of violating the University's Code of Academic Integrity (the "Notice Letter").[19] The Notice Letter described an allegation from Professor Tong that Plaintiff's Lab Report was substantially similar to another student's Lab Report.[20] Plaintiff subsequently met with Marcia Glickman, Deputy Director of the OSC, who treated Plaintiff as a perpetrator from the outset.[21]

On June 7, 2021, Plaintiff made a formal bias incident report to the University regarding the discrimination to which she had been subjected in her courses.[22] Her complaint noted that she

---

[12] *Id.* ¶¶ 58, 72, 77.

[13] *Id.* ¶¶ 59, 61.

[14] *Id.* ¶¶ 61–62.

[15] *Id.* ¶ 63.

[16] *Id.* ¶¶ 52–53.

[17] *Id.* ¶ 54.

[18] *Id.* ¶ 55.

[19] *Id.* ¶ 64.

[20] *Id.* ¶ 65.

[21] *Id.* ¶ 74.

[22] *Id.* ¶ 76.

and A.R. were being accused of cheating, while H.B., a white man who was involved in the incident, was not.[23] Plaintiff thereafter met with the Vice Provost and Director of the University's Women's Center and described the discriminatory incidents she had experienced, but the meeting was cut short and there was never another meeting.[24] On July 9, 2021, Plaintiff received an official letter charging her with an academic integrity violation.[25] Plaintiff requested a hearing, which was scheduled for August 26, 2021.[26]

On August 24, 2021, Glickman and the OSC added new exhibits to the investigation file consisting of screenshots of text messages between A.R. and H.B., which Plaintiff alleges were coordinated and falsified so that Plaintiff would be found responsible even though A.R. had copied Plaintiff's report.[27] Plaintiff emailed Hearing Officer Dan Kessler requesting a stay of the hearing and seeking the opportunity to present a forensic expert who could testify to the authenticity of the text messages.[28] Plaintiff also requested that the University obtain metadata of A.R.'s Lab Report.[29] All of those requests were denied, but Kessler stated that the University might be willing to accept a written statement from the forensic expert at the hearing.[30] Plaintiff again requested a stay of the hearing so that the forensic expert could prepare a written statement, but the request was again denied.[31]

---

[23] *Id.* ¶ 77.

[24] *Id.* ¶¶ 78–79.

[25] *Id.* ¶ 81.

[26] *Id.* ¶ 82.

[27] *Id.* ¶¶ 71–72, 83–84, 87.

[28] *Id.* ¶¶ 86, 88.

[29] *Id.* ¶ 92.

[30] *Id.* ¶¶ 89, 93.

[31] *Id.* ¶¶ 90–91.

On August 26, 2021, the University proceeded with the hearing.[32] It was the first time the University had ever held a remote hearing, where some members of the Hearing Panel attended in person and others attended by video.[33] The format of the hearing led to technical issues. Witness testimony was halted on several occasions, which affected the ability to assess credibility and made Plaintiff extremely nervous.[34] There were also procedural issues. Although Plaintiff had been promised that witnesses would be sequestered, they were not.[35] For example, Professor Tong testified as a witness and then remained in the hearing room, which made it difficult for Plaintiff to fully present her side of the story.[36] After the hearing, the Hearing Panel found Plaintiff responsible for a violation of the Academic Integrity Code and recommended a one-and-a-half year suspension, a transcription notation of the violation during the suspension, and a requirement that Plaintiff write A.R. an apology letter.[37] A.R. was not found responsible.[38]

In preparation for an anticipated appeal, Plaintiff requested to review the hearing transcript and video.[39] Nettleton permitted Plaintiff to review the hearing records but only under her supervision.[40] On September 28, 2021, Plaintiff submitted her appeal, raising procedural challenges and attacking the sanction as disproportionate.[41] On November 12, 2021, the decision and sanction were upheld by letter from Sophia Lee, the Disciplinary Appellate Officer.[42]

---

[32] *Id.* ¶ 94.

[33] *Id.* ¶ 99.

[34] *Id.* ¶¶ 100–01.

[35] *Id.* ¶ 95.

[36] *Id.* ¶¶ 96–97.

[37] *Id.* ¶ 102.

[38] *Id.* ¶ 103.

[39] *Id.* ¶ 105.

[40] *Id.*

[41] *Id.* ¶ 108.

[42] *Id.* ¶ 109.

On July 11, 2022, Plaintiff filed the Complaint and sought leave to proceed under a pseudonym.[43] On September 19, 2022, the University filed its Motion to Dismiss the Complaint for failure to state a claim, which was fully briefed.[44] On March 23, 2023, the Court entered an Order granting Plaintiff's request that the non-party students referenced in the Complaint be referred to by their initials, but denying Plaintiff's request to use a pseudonym.[45] Plaintiff appealed, and the proceedings were stayed.[46] On May 24, 2024, the Third Circuit affirmed this Court's Order.[47] On June 17, 2024, the mandate issued, and the Court lifted the stay on the following day.[48] On July 1, 2024, Plaintiff re-filed her Complaint but replaced her previous pseudonym with her full name.[49]

## II.    LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[50] A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[51] The "allegations must be enough to raise a right to relief above the speculative level"; something more than a mere *possibility* of a claim must be alleged.[52] The complaint must set

---

[43] Compl. [Doc. No. 1]; Pl.'s Mot. Protective Order [Doc. No. 2].

[44] Def.'s Mot. Dismiss [Doc. No. 16]; Pl.'s Resp. Opp'n [Doc. No. 17]; Def.'s Reply Supp. [Doc. No. 19].

[45] Order, Mar. 23, 2023 [Doc. No. 20].

[46] Notice of Appeal [Doc. No. 21]; Order, Apr. 11, 2023 [Doc. No. 26].

[47] *Doe v. Univ. of Pa.*, No. 23-1613, 2024 WL 2575702 (3d Cir. May 24, 2024).

[48] Mandate, June 17, 2024 [Doc. No. 27]; Order, June 18, 2024 [Doc. No. 29].

[49] Compl. [Doc. No. 30].

[50] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[51] *Id.* (citing *Twombly*, 550 U.S. at 556).

[52] *Twombly*, 550 U.S. at 555 (citations omitted).

forth "direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory."[53] In deciding a motion to dismiss, a court should not assess the probability of whether the alleged facts can or will be proved.[54] The standard "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element" of a claim.[55] The question is not whether the plaintiff ultimately will prevail but whether the complaint is "sufficient to cross the federal court's threshold."[56] The court must consider only those facts alleged in the complaint, accepting the allegations as true and drawing all logical inferences in favor of the non-moving party.[57] Courts are not, however, bound to accept as true legal conclusions framed as factual allegations.[58]

## III.   DISCUSSION

### A.  Retaliation Under Title VI

Title VI of the Civil Rights Act provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[59] To state a claim for retaliation under Title VI, a plaintiff must plead facts showing that: (1) she was engaged in a protected activity; (2) the funded entity subjected her to an adverse action after or contemporaneously with the protected activity; and (3) there is a causal

---

[53] *Id.* at 562 (quotation marks and citation omitted).

[54] *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).

[55] *Id.* (quotation marks omitted) (quoting *Twombly*, 550 U.S. at 556).

[56] *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation omitted). At the motion to dismiss stage, a court determines only whether a plaintiff will be permitted to seek evidence in support of the claims in the complaint. *See Twombly*, 550 U.S. at 556, 558–59.

[57] *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *Fay v. Muhlenberg Coll.*, No. 07-4516, 2008 WL 205227, at *2 (E.D. Pa. Jan. 24, 2008).

[58] *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Twombly*, 550 U.S. at 555.

[59] 42 U.S.C. § 2000d (1964).

link between the adverse action and the protected activity.[60] Title VI retaliation claims are governed by the same standard as claims brought in other familiar civil rights contexts, including Title VII, Title IX, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act.[61]

Under the first prong, the Third Circuit has long recognized that protected activity includes not only "formal charges of discrimination" but also "informal protests of discriminatory . . . practices, including making complaints[.]"[62] Accepting the allegations in the Complaint as true, the email Plaintiff sent to Professor Tong raising concerns of racial bias on May 2, 2021, the formal bias incident report Plaintiff submitted to the University on June 7, 2021, and Plaintiff's subsequent meeting with the Vice Provost and Director of the University's Women's Center regarding her formal complaint each constitute protected activity. As for the second prong, the Complaint sufficiently alleges that Plaintiff was charged with and found responsible for an academic integrity violation contemporaneously with or shortly after she made her complaints of discriminatory treatment.

Regarding the third prong, the University argues that Plaintiff has failed to allege a causal link between her complaints about Professor Tong and the Hearing Panel's ultimate findings and recommendations. The University avers that none of the decisionmakers involved in the proceedings—specifically, the designated Hearing Officer, other members of the Hearing Panel,

---

[60] *Whitfield v. Notre Dame Middle Sch.* 412 F. App'x 517, 522 (3d Cir. 2011) (citing *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)); *see also L.L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 551 (3d Cir. 2017).

[61] *See Williams v. Pennridge Sch. Dist.*, 782 F. App'x 120, 125 (3d Cir. 2019) ("We apply the same standard for a retaliation claim whether raised under Title VI, Title IX, or the PHRA." (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)); *Williams v. Pa. State Univ.*, 697 F. Supp. 3d 297, 323 n.192 (M.D. Pa. 2023) ("Courts apply the same standard for claims brought under Title VI, Title IX, the Pennsylvania Human Relations Act, and 42 U.S.C. § 1981." (citing cases)); *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003) (adopting standard from Title VII context).

[62] *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)); *see also Ke v. Drexel Univ.*, 645 F. App'x 161, 165 (3d Cir. 2016); *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

and the Disciplinary Appellate Officer—are alleged to have been made aware of Plaintiff's

informal or formal complaints of discrimination.[63] However, Professor Tong is alleged to have

been directly and intimately involved in the disciplinary proceedings against Plaintiff.[64] Even if

Professor Tong was not a decisionmaker, insofar as he did not sit on the Hearing Panel, the

Complaint sufficiently alleges that his initial accusation of academic misconduct was the

triggering event for all of the proceedings against Plaintiff, and that his testimony was integral to

the Panel's finding of responsibility. At this early stage of the litigation, Plaintiff need only plead

facts allowing the Court to reasonably infer retaliation against her for her protected conduct.

Plaintiff has done so. Accordingly, the Court will deny the University's Motion as to Plaintiff's

retaliation claim under Title VI, and the claim will proceed to discovery.

## B.  Breach of Contract

Plaintiff asserts a breach of contract claim based on several alleged agreements,

representations, covenants, and warranties between her and the University. Specifically, the

Complaint cites: (1) the University of Pennsylvania Policy Against Retaliation (the

"Retaliation Policy"); and (2) the Charter of the University of Pennsylvania Student Disciplinary

System (the "Charter").[65]

The parties agree that Plaintiff's supplemental breach of contract claim is governed by

Pennsylvania state law.[66] In order to state a claim for breach of contract under Pennsylvania law,

---

[63] Def.'s Mem. Law Supp. Mot. Dismiss at 5–6 [Doc. No. 16-2] (citing *Park v. Temple Univ.*, No. 16-5025, 2017 WL 368087 (E.D. Pa. Jan. 25, 2017)).

[64] *Cf. Park*, 2017 WL 368087, at *5 (holding that retaliation claim was insufficiently pleaded because there were no allegations connecting student's complaint of discrimination "to someone *actually involved* in the disciplinary process that resulted in his expulsion" (emphasis added)).

[65] The Complaint also cites the University of Pennsylvania Policy on Equal Opportunity and Affirmative Action, but in response to the Motion to Dismiss, Plaintiff stated that she is not alleging a breach of contract claim based upon this policy. Pl.'s Resp. Opp'n at 17 [Doc. No. 17].

[66] Def.'s Mem. Law Supp. Mot. Dismiss at 7 n.5 [Doc. No. 16-2]; Pl.'s Resp. Opp'n at 13–14 [Doc. No. 17] (citing Pennsylvania law); Def.'s Reply Supp. at 5 [Doc. No. 19].

a plaintiff must sufficiently allege "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."[67] "[T]he relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against [an] institution for breach of contract where the institution ignores or violates portions of the written contract."[68] "The contract between an educational institution and a student includes any 'agreement between the parties concerning disciplinary procedures, contained within a portion of the student handbook.'"[69] The University does not dispute the contractual nature of the student-university relationship, but it disagrees that certain of the policies Plaintiff identifies are enforceable, written contracts.[70]

### 1. The Retaliation Policy

The University argues that the Retaliation Policy is part of the Human Resources Policy Manual, and therefore it applies only to employees, not students. In the alternative, the University argues that even if the Retaliation Policy could be read as applying to students, it incorporates by reference an explicit disclaimer that "[t]he policies included on this website are

---

[67] *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010) (quoting *Hart v. Arnold*, 884 A.2d 316, 332 (Pa. Super. Ct. 2005)).

[68] *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 810 (E.D. Pa. 2017) (quoting *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999)).

[69] *Id.* (quoting *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. Ct. 2007)).

[70] Plaintiff separately asserts that, in addition to the University's express promises in its written policies, the contracts between Plaintiff and the University "contain an implied covenant of good faith and fair dealing, which implicitly guaranteed that any proceedings would be conducted with basic fairness." Compl. ¶ 153 [Doc. No. 30]. Pennsylvania courts have recognized that parties to at least some contracts are bound by an "obligation of good faith," but any such obligation "is tied specifically to and is not separate from the duties a contract imposes on the parties." *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 434 n.11 (Pa. 2001). *But see Hanaway v. Parkesburg Grp., LP*, 168 A.3d 146, 156–58 (Pa. 2017) (declining to recognize a wholesale adoption by the Pennsylvania General Assembly of Section 205 of the Restatement (Second) of Contracts).

Because the implied covenant "functions 'as an interpretive tool' to aid the court in evaluating breach of contract claims" rather than providing a standalone cause of action, *Tuno v. NWC Warranty Corp.*, 552 F. App'x 140, 144 (3d Cir. 2014) (quoting *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000)), this Court need not "separately consider any claim for breach of the duty of good faith and fair dealing[.]" *Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 815 n.8. The Court will, however, take into consideration whether the alleged breaches of specific provisions comport with the University's duty to fulfill its contractual duties in good faith.

not legal documents" and that "the language [is not] intended to establish a contract[.]"[71] Plaintiff responds that the text of the Retaliation Policy specifically refers to retaliation by faculty members against students, it contains specific, procedural promises, and the disclaimer is ineffective for failure to require assent.[72] The Court need not reach consideration of the disclaimer because, even if the Retaliation Policy were intended to be a contract, the Complaint fails to sufficiently allege that Plaintiff was a party to it.

Courts review agreements between students and universities concerning disciplinary procedures "as we would any other agreement between two private parties."[73] A plaintiff must have standing to sue in federal court, and "[w]ith respect to breach of contract cases, a party is 'aggrieved' and therefore has standing to bring a breach of contract claim only if they are a party to the contract at issue."[74] A policy located in a human resources manual for university employees is materially distinguishable from procedures found in a student handbook. Although Plaintiff argues that the Retaliation Policy's "plain wording" makes clear "that it applies to *all* members of the University, including students,"[75] the copy of the Retaliation Policy attached to the University's Motion states only that it applies to "All University Employees."[76] To be sure,

---

[71] Def.'s Mem. Law Supp. Mot. Dismiss at 11 [Doc. No. 16-2] (quoting Def.'s Mot. Dismiss, Ex. D, Policy Manual Disclaimer [Doc. No. 16-6]); Def.'s Mot. Dismiss, Ex. B, Retaliation Policy, at 2 [Doc. No. 16-4] (including hyperlink to Policy Manual Disclaimer). The University has attached the Charter, the Retaliation Policy, and the Policy Manual Disclaimer as exhibits to its Motion. Because the Complaint expressly relies upon the first two of those documents—and because the latter incorporates the Policy Manual Disclaimer by reference—the Court will consider them in deciding the University's Motion to Dismiss. *Brown v. Daniels*, 128 F. App'x 910, 913 (3d Cir. 2005) (holding that at the motion to dismiss stage, "courts generally consider only allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim" (citation omitted)).

[72] Pl.'s Resp. Opp'n at 14–16 [Doc. No. 17].

[73] *Reardon*, 926 A.2d at 480 (citing *Murphy*, 777 A.2d at 428).

[74] *Takeda Pharms. U.S.A., Inc. v. Spireas*, 400 F. Supp. 3d 185, 205 (E.D. Pa. 2019) (citing *ECN Fin., LLC v. Chapman*, No. 17-2842, 2018 WL 623679, at *3 (E.D. Pa. Jan. 30, 2018)).

[75] Pl.'s Resp. Opp'n at 15 [Doc. No. 17].

[76] Def.'s Mot. Dismiss, Ex. B, Retaliation Policy, at 2 [Doc. No. 16-4].

the Retaliation Policy includes provisions relevant to student interests. However, an allegation that a contract has some impact on the rights of third parties, standing alone, is insufficient. Furthermore, Plaintiff does not argue for an exception to the rule under the third-party beneficiary doctrine.[77] Accordingly, the University's Motion will be granted as to any breach of contract claim brought under the Retaliation Policy.

### 2.   The Charter

The University presupposes that, in theory, the Charter might create contractual obligations between the University and its students, but it contends that Plaintiff has failed to identify duties in the Charter corresponding to the University's alleged breaches and, to the extent that Plaintiff has identified specific duties, she has failed to allege facts demonstrating that the University breached them. The Complaint quotes the following provisions from the Charter:

> [II.A.3.] Until there is a determination to the contrary by voluntary agreement to sanctions or by a Disciplinary Hearing Panel, there is a presumption that an accused student has not violated University rules, regulations, or policies. . . .

> [II.A.4.] When a complaint is filed, the OSC promptly gives written notice of the complaint and its allegations to the student(s) alleged to have violated University rules. A copy of the Charter will be included with the notice, as well as a list of potential advisors who have received training from the OSC. . . .

---

[77] "Under Pennsylvania law, a contract creates a third-party beneficiary when its language affirmatively indicates mutual intent to benefit that third-party." *Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan*, 817 F. Supp. 2d 515, 527 (E.D. Pa. 2011) (citation omitted). Pennsylvania has also adopted Section 302 of the Restatement (Second) of Contracts, which sets forth an exception to that general rule. *Guy v. Liederbach*, 459 A.2d 744, 751 (Pa. 1983).

In the absence of affirmative language regarding the parties' intent to benefit a nonparty, the analysis is two-fold: First, it must be shown that recognition of the beneficiary's right is "appropriate to effectuate the intention of the parties[.]" *Medevac*, 817 F. Supp. 2d at 527 (quoting Restatement (Second) of Contracts § 302(1)). Pennsylvania courts require at this first step that the circumstances be "compelling." *Id.* (quoting *Scarpitti v. Weborg*, 609 A.2d 147, 150–51 (Pa. 1992)). Second, a beneficiary must show that she falls into one of two categories: (1) a creditor to whom a promisee has an obligation to pay, whose obligation will be satisfied by the performance of the promise; or (2) a donee, where "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Id.* (quoting Restatement (Second) of Contracts § 302(1)(a), (b)).

Because the parties do not assert arguments under the third-party beneficiary doctrine, the Court does not address here whether the doctrine applies with respect to the Retaliation Policy vis-à-vis students at the University.

[II.F.3.1.] Within a reasonable time before the hearing or any other time frame specified by the DHO, the OSC and the respondent(s) will exchange among themselves and with the DHO copies of all exhibits to be presented, the names of witnesses to be called, and a brief summary of the substance of testimony expected to be presented to the Hearing Panel. . . .

[II.F.3.3.] In exceptional circumstances, when a witness or exhibit does not become known or available until immediately before the hearing, the DHO may, at her or his discretion, permit the evidence to be presented or may reschedule the hearing to a later time. . . .

[II.F.3.4.] If a respondent or the OSC anticipates that a key witness will be unavailable for a hearing, they may ask the DHO to preserve the testimony of the witness on tape and present it as evidence at the hearing. The OSC and the respondent(s) must be notified in advance of the date, time and place of the taping. . . .

[II.F.5.3.] Before the Hearing Panel makes its recommendation on sanctions, it will review any previous disciplinary offenses by and sanctions against the respondent(s) and sanctions imposed in other similar cases.[78]

The Complaint then identifies conduct by the University allegedly violating each of the above provisions,[79] and later alleges a broader list of conduct identified as breaches of the University's collective "express and/or implied agreements to Plaintiff[.]"[80]

### a.   Presumption of Innocence

First, Plaintiff alleges that the University failed to afford her the presumption of innocence to which she was entitled under Section II.A.3 of the Charter.[81] The University argues that the Complaint is conclusory and does not plead sufficient factual detail to support this allegation. The Court agrees. The Complaint alleges that OSC Deputy Director Glickman treated Plaintiff "as a perpetrator from the outset," including by investigating Plaintiff's work history to

---

[78] Compl. ¶¶ 116, 118, 120, 123, 125, 127 [Doc. No. 30]; *see also* Def.'s Mot. Dismiss, Ex. C, Charter [Doc. No. 16-5].

[79] *See* Compl. ¶¶ 117, 119, 121–22, 124, 126, 128 [Doc. No. 30].

[80] *Id.* ¶ 154.

[81] *See id.* ¶¶ 123–24, 154.

see if she was telling the truth.[82] According to the Complaint, Glickman drove by an organization with which Plaintiff was previously associated as a social worker, Glickman got out of her car at that location to see Plaintiff's name on a mural, and later told Plaintiff about it during a meeting.[83] These allegations are insufficient to plausibly suggest that Plaintiff was denied a presumption of innocence. The Court will dismiss Plaintiff's breach of contract claim insofar as it alleges that the University breached Section II.A.3.

b. *Notice*

Second, Plaintiff alleges that the Notice Letter she received from the OSC on May 12, 2021, provided insufficient notice of the misconduct accusation against her in violation of Section II.A.4 of the Charter.[84] The University avers that the Charter requires only that the OSC promptly give written notice of the complaint and its allegations, and that the level of detail provided in the Notice Letter was sufficient to satisfy its contractual obligations.

The Complaint acknowledges that Plaintiff received the Notice Letter in advance of the hearing, and that the letter conveyed that Professor Tong was accusing her of submitting a Lab Report that was substantially similar to another student's Lab Report. Although the Complaint alleges that the letter contained the wrong date of the alleged incident (listing the date of Professor Tong's accusation as May 10, 2021, rather than the Lab Report submission date of April 30, 2021), and that the letter failed to identify the other student,[85] these allegations do not give rise to an inference that the University breached its duty to provide timely and adequate

---

[82] *Id.* ¶¶ 74–75.

[83] *Id.* ¶ 75.

[84] *See id.* ¶¶ 116–17, 154.

[85] *Id.* ¶¶ 65–67.

notice of the allegations against Plaintiff.[86] Indeed, the Complaint elsewhere notes that after Plaintiff received the Notice Letter (and before she met with Glickman), "Plaintiff contacted A.R. in an attempt to understand what had happened."[87] Because Section II.A.4 of the Charter does not require the level of factual detail Plaintiff alleges was required, the breach of contract claim will be dismissed to the extent that it relies on the Charter's notice provision.

### c. Disclosure of Exhibits

Third, Plaintiff alleges that the OSC's addition of new exhibits two days before the hearing was a violation of the University's duty to exchange evidence "[w]ithin a reasonable time before the hearing" under Section II.F.3.1 of the Charter.[88] The University responds that there is no bright-line rule for defining a reasonable amount of time, and that Plaintiff has failed to allege why the 48 hours she was provided were insufficient. To the contrary, the Complaint describes Plaintiff's multiple requests to postpone the hearing, and it alleges that 48 hours was an insufficient amount of time for Plaintiff to review and respond to the new evidence. That allegation is facially plausible. The Court will permit Plaintiff to pursue discovery on her breach of contract claim arising from Section II.F.3.1.

### d. Failure to Reschedule and Denial of Forensic Expert

Fourth, Plaintiff alleges that the University breached its duty under Section II.F.3.3 of the Charter when it denied Plaintiff's requests for a postponement of the hearing based on the new evidence and the time needed to prepare a statement from a forensic expert.[89] The University asserts that Section II.F.3.3 permits rescheduling by a Disciplinary Hearing Officer "at her or his

---

[86] See Trs. of the Univ. of Pa., 270 F. Supp. 3d at 816.

[87] Compl. ¶ 73 [Doc. No. 30].

[88] Id. ¶¶ 118–19.

[89] Id. ¶¶ 120–22.

discretion[.]"[90] Under Pennsylvania law, courts must ascertain a contract's meaning in accordance with broader contract principles.[91] Just as "the parties' contractual intent cannot be gleaned by ignoring all but one sentence in the Contract, and then reading that sentence out of context," established contract principles dictate that "the intent of contracting parties" is commonly "inherent in the totality of their contract."[92]

The Charter states broadly that the purpose of the University's Student Disciplinary System is to "provid[e] a fair and effective mechanism for investigating and resolving disputes involving students and alleged violations[.]"[93] The Charter also provides that Disciplinary Hearing Officers are responsible for "overseeing the procedural integrity of disciplinary hearings" and "will, for example[,] . . . assist parties to adhere to the basic principles of fairness prior to, during, and subsequent to disciplinary proceedings[.]"[94] Moreover, when discussing the discretion of a Disciplinary Hearing Officer in another context—with respect to whether a respondent's advisor may question witnesses—the Charter indicates that "[t]he DHO's exercise of discretion . . . will be guided by the principles that govern disciplinary hearings, specifically fairness, the need for orderly procedures, and the Hearing Panel's duty to understand the facts and parties in the disciplinary matter."[95]

Given this essential context, Plaintiff has sufficiently alleged that the University's decision not to reschedule the August 26, 2021 hearing constituted a breach of its contractual

---

[90] Def.'s Mem. Law Supp. Mot. Dismiss at 13 [Doc. No. 16-2] (emphasis omitted) (quoting Compl. ¶ 120 [Doc. No. 1]).

[91] *Murphy*, 777 A.2d at 432.

[92] *Id.*

[93] Def.'s Mot. Dismiss, Ex. C, Charter sec. I.A. [Doc. No. 16-5].

[94] *Id.* sec. I.D.4.

[95] *Id.* sec. II.F.4.6.

obligations. The Complaint plausibly alleges that the University's refusal to postpone the August 26, 2021 hearing date deprived Plaintiff a reasonable opportunity to introduce a forensic expert regarding the authenticity of the late-breaking text-message screenshots between A.R. and H.B. Although the University contends that it had no contractual obligation under the Charter to facilitate the production of exculpatory witnesses,[96] the broader context and procedures described in the Charter establish that it was the responsibility of the Disciplinary Hearing Officer to oversee the procedural integrity of the hearing and to assist the Hearing Panel with its duty to understand the facts of the dispute.

For similar reasons, the Court holds that Plaintiff has plausibly alleged a breach of contract claim arising from Section II.F.3.4 of the Charter, which provides that respondents may request the taping of testimony of key witnesses who are unavailable for a hearing and present the recordings as evidence at the hearing.[97] The University asserts that Plaintiff failed to allege ever having requested such a taping. That argument is without merit, given the Complaint's allegations that the University denied Plaintiff's request to produce live testimony from the expert, and then refused to reschedule the hearing such that Plaintiff could not have reasonably prepared a written report as an alternative.[98] The Motion to Dismiss will be denied as to Plaintiff's breach of contract claim based on the University's refusal to postpone the hearing and effective denial of Plaintiff's opportunity to present a forensic expert.

e.  *Disproportionate Sanction and Failure to Account for Record*

Fifth, Plaintiff alleges that the University breached its contractual obligations under Section II.F.5.3 of the Charter when the Hearing Panel recommended a disproportionate sanction

---

[96] Def.'s Mem. Law Supp. Mot. Dismiss at 12 [Doc. No. 16-2].

[97] Def.'s Mot. Dismiss, Ex. C, Charter sec. II.F.3.4 [Doc. No. 16-5]; *see also* Compl. ¶ 125 [Doc. No. 30].

[98] Compl. ¶¶ 88–91 [Doc. No. 30].

and failed to take Plaintiff's clean disciplinary record into consideration. The University argues that Plaintiff does not allege sufficient factual detail supporting a breach of this provision. The Court agrees. The Complaint alleges that the recommended sanction of a one-and-a-half year suspension "did not take into account Plaintiff's spotless disciplinary record or her outstanding grades,"[99] but it does not substantiate that conclusory statement with supporting factual allegations. Accordingly, the Court will dismiss any breach of contract claim predicated on the alleged severity of the suspension and the University's failure to take Plaintiff's record or similar cases involving academic integrity violations into account.

### f. *Allowing and Fostering Discrimination and Failing to Remedy*

Finally, the Complaint alleges that the University breached its contractual duties by allowing and fostering discrimination against Plaintiff, failing to remedy the discrimination after Plaintiff made her complaints, and retaliating against Plaintiff for making those complaints. Given the Court's dismissal of Plaintiff's breach of contract claim predicated on the Retaliation Policy, there are no remaining contractual provisions identified in the Complaint setting forth a duty that corresponds to these alleged breaches. To the extent that Plaintiff seeks redress for the University's alleged retaliation against her for her complaints of discrimination against Professor Tong, such remedies lie in her retaliation claim under Title VI rather than under a contractual theory of liability. The Court will dismiss any breach of contract claims insofar as they are based on alleged race or sex discrimination against Plaintiff.

## IV.   CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss will be granted in part and denied in part. An order will be entered.

---

[99] *Id.* ¶ 104.