IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HARINI REDDY,

        **Plaintiff,**

    v.

UNIVERSITY OF PENNSYLVANIA,

        **Defendant.**

**CIVIL ACTION NO.  22-2689**

## MEMORANDUM OPINION

**Rufe, J.**                                                                                  **March 24, 2026**

Plaintiff Harini Reddy, a former student at the University of Pennsylvania, filed this action against the University alleging retaliation in violation of Title VI of the Civil Rights Act of 1964[1] ("Title VI") and breach of contract. This Court previously dismissed breach of contract claims that were based on the University's retaliation policy or on race or sex discrimination, and dismissed, in part, breach of contract claims based on provisions in the University's charter on student discipline.[2] Pending now is the University's motion for summary judgment on all remaining claims and issues. For the reasons set forth below, the motion will be granted.

## I.      BACKGROUND[3]

In August 2020, Plaintiff matriculated to the University as an enrollee in its Pre-Health Post-Baccalaureate Program.[4] In the Spring 2021 semester, she was enrolled in CHEM 242

---

[1] 42 U.S.C. § 2000d *et seq.*

[2] *See* 8/22/24 Memorandum Opinion [Doc. No. 32]; 8/22/24 Order [Doc. No. 33].

[3] The Court's factual account of this case is drawn from the parties' Statement of Stipulated Material Facts ("SSMF") and the documentary and testimonial evidence attached to the parties' summary judgment submissions. Any facts in dispute are identified as such. For purposes of the Court's analysis in the Discussion, all evidence will be viewed in the light most favorable to Plaintiff, and all justifiable inferences will be drawn in her favor. *See Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[4] SSMF ¶ 1 [Doc. No. 59-1].

Organic Chemistry II (the "Lecture Course") and CHEM 248 Experimental Organic Chemistry B (the "Lab Course").[5] The courses were taught by Professor Simon Tong and staffed by Teaching Assistants ("TAs").[6] A student's grade in the Lecture Course was based on homework, problem sets, weekly quizzes, and an exam.[7] Grades in the Lab Course were based on attendance, prelab assignments, notebook keeping, and the Multistep Lab Report.[8] Most assignments were to be submitted through Canvas, an online platform where professors post course materials and students upload assignments.[9]

### A.    Plaintiff's Interactions with Professor Tong

Throughout the semester, Plaintiff sought certain allowances and extensions on her assignments. On February 9, 2021, she requested to upload a corrected "Notebook Page/Lab Report" PDF after the deadline, and Professor Tong allowed this without penalty.[10] On March 20, 2021, she requested to submit a weekly quiz after the deadline, claiming the link timed out, and Professor Tong allowed her to do so without penalty.[11] On April 6, 2021, she sought, and later received, an extension on her Aldol prelab assignment due to a laptop issue, and on April 7 she received longer extensions on her Aldol and Multistep Synthesis prelabs for the same issue.[12] Professor Tong also confirmed that Plaintiff received full credit for homework that she could not

---

[5] *Id.* ¶ 4.

[6] *Id.* ¶¶ 4, 8.

[7] *Id.* ¶ 12.

[8] *Id.* ¶¶ 13-14.

[9] *Id.* ¶¶ 9-10

[10] *See id.* ¶¶ 17-18. This initial "Notebook Page/Lab Report" submission is different than the Multistep Lab Report, which is defined herein as the "Lab Report."

[11] *Id.* ¶ 19.

[12] *Id.* ¶¶ 21-24. In granting the extensions, Professor Tong asked Plaintiff to confirm that her laptop was under repair. *Id.* ¶ 24.

complete with a mobile device.[13] Plaintiff asked Professor Tong on April 17, 2021, to accept a late, emailed copy of her Quiz 9 as she was unsure if it was received on Canvas, and Professor Tong, despite initially ruling that a late penalty would apply, did not impose a penalty.[14]

Eventually, Professor Tong declined to grant such requests. On April 24, 2021, after Plaintiff asked a TA to accept a substitute Quiz 10 submission after the deadline to replace an accidentally "cropped" file, Professor Tong told the TA to grade Plaintiff's original submission as it was the "fourth time she has done something like this on a quiz for this semester."[15] Professor Tong also told Plaintiff that he would award only half-credit for Quiz 11 images she submitted on May 3, 2021, after the deadline on Canvas.[16] In their correspondence about Quiz 11, Plaintiff wrote on May 4, 2021, that Professor Tong's actions were "unnecessarily punitive."[17] On May 8, 2021, she emailed him, "Your punitiveness towards me only sets me up for more issues. You may be unknowingly biasing yourself against me."[18]

**B.      The Alleged Academic Integrity Violation and the Formal Bias Complaint**

Following a class-wide extension, the Multistep Lab Report (the "Lab Report") was due on April 30, 2021.[19] Plaintiff's classmate, A.R.,[20] submitted her Lab Report on April 29, 2021, and resubmitted it on April 30, 2021, at 10:24 p.m.[21] Plaintiff submitted her Lab Report on April

---

[13] *Id.* ¶¶ 26-27.

[14] *Id.* ¶¶ 29-30; 4/17/21 Reddy-Tong Emails [Doc. No. 60-3]; 4/20/21 Reddy-Tong Emails [Doc. No. 60-4].

[15] SSMF ¶¶ 31-32 [Doc. No. 59-1].

[16] *Id.* ¶¶ 34-36; 5/3/21 Tong-Reddy Email [Doc. No. 60-5 at p. 3].

[17] SSMF ¶ 37 [Doc. No. 59-1]; 5/4/21 Reddy-Tong Email [Doc. No. 60-5 at p. 2].

[18] SSMF ¶ 38 [Doc. No. 59-1]; 5/8/21 Reddy-Tong Email [Doc. No. 60-6].

[19] SSMF ¶ 39 [Doc. No. 59-1].

[20] Consistent with the protocol set forth by an Order of this Court, which the Third Circuit affirmed, the Court refers to non-party students by their initials. *See* 3/23/23 Order [Doc. No. 20]; Judgment [Doc. No. 27].

[21] SSMF ¶¶ 40-41 [Doc. No. 59-1].

30, 2021, at 11:12 p.m.[22] On May 10, 2021, a TA emailed Professor Tong upon noticing "a lot of overlap between the two students' reports."[23] Using Turnitin, a software that detects plagiarism, Professor Tong compared A.R. and Plaintiff's Lab Reports that same day and determined they were substantially similar.[24] That same day, Professor Tong filed an academic integrity complaint with the University's Office of Student Conduct ("OSC"), naming Plaintiff and A.R.[25] Plaintiff and A.R. were informed of the complaint in notice letters sent by OSC on May 12, 2021.[26] OSC interviewed Plaintiff, A.R., Professor Tong, and another classmate, "H.B."[27]

On June 7, 2021, Plaintiff submitted a formal bias report accusing Professor Tong of discrimination on the grounds that he had reported her and another "brown student" to OSC while not reporting a white student.[28] Plaintiff added that she felt singled out as the only Indian woman in her program.[29] Regarding her bias report, Plaintiff met with the Associate Vice Provost of University Life and the University's Director of Women's Center.[30]

On July 9, 2021, OSC sent Plaintiff a letter (the "Charge Letter") charging her with violating the University's Code of Academic Integrity for submitting a Lab Report that was

---

[22] *Id.* ¶ 42.

[23] *Id.* ¶ 43.

[24] *Id.* ¶¶ 44-45.

[25] *Id.* ¶ 46; Receipt of Academic Integrity Compl. [Doc. No. 60-7].

[26] SSMF ¶ 47 [Doc. No. 59-1].

[27] *Id.* ¶ 48. H.B. also received a letter alleging a violation of the Code of Academic Integrity. *Id.* ¶ 55. The disciplinary matter involving H.B. was resolved through an informal agreement. *Id.* ¶ 56.

[28] *Id.* ¶¶ 58-59; Bias Incident Reporting Form [Doc. No. 60-11].

[29] SSMF ¶ 59 [Doc. No. 59-1]; Bias Incident Reporting Form [Doc. No. 60-11].

[30] SSMF ¶ 60 [Doc. No. 59-1].

copied from A.R.'s report.[31] The Charge Letter described the evidence gathered by OSC, including texts between A.R. and Plaintiff on May 12, 2021.[32] It further alleged:

> On or about May 12, 2021, [Plaintiff] contacted [A.R.] first by facetime and then by text at approximately 5:51 pm. While on facetime [Plaintiff] sent [A.R.] a copy of [Plaintiff's] lab report. The metadata from that word document shows that the document was created on April 30, 2021 at 11:10 PM by [H.B.] and last modified by [Plaintiff] on April 30, 2021 at 11:13 PM.[33]

The Charge Letter also stated that H.B. had sent a copy of A.R.'s Lab Report to Plaintiff after H.B. received it from A.R.[34] On July 10, 2021, Plaintiff sent an email request for a hearing to Marcia Glickman, the Deputy Director of OSC and case manager for Plaintiff's disciplinary case.[35]

### C.    Plaintiff's Disciplinary Proceedings

The Charter of the University of Pennsylvania Student Disciplinary System (the "Charter") sets rules and procedures for disciplinary hearings.[36] Under the Charter, a Disciplinary Hearing Officer ("DHO") "presides over all disciplinary hearings held under [the] Charter."[37] The Charter adds, "[t]he DHO is responsible for overseeing the procedural integrity of disciplinary hearings. The DHO will, for example: consider and resolve pre-hearing challenges to the authority or procedures of a Disciplinary Hearing Panel; rule on all disqualification requests and objections to individual panel members; assist parties to adhere to the basic principles of fairness prior to, during, and subsequent to disciplinary proceedings; and

---

[31] *Id.* ¶ 49; *see* Charge Letter at 1 [Doc. No. 60-13].

[32] SSMF ¶ 50 [Doc. No. 59-1]; Charge Letter [Doc. No. 60-13].

[33] SSMF ¶ 51 [Doc. No. 59-1]; Charge Letter at 3 [Doc. No. 60-13].

[34] SSMF ¶ 52 [Doc. No. 59-1]; Charge Letter at 3-4 [Doc. No. 60-13].

[35] SSMF ¶ 54 [Doc. No. 59-1].

[36] *See id.* ¶¶ 64-68; Charter of the University of Pennsylvania Student Disciplinary System ("Charter") [Doc. No. 61-2].

[37] SSMF ¶ 65 [Doc. No. 59-1].

may consult at any time with students, faculty members, the University's General Counsel or others about procedural issues."[38]  The DHO exercises discretion in making decisions concerning the exchange of exhibits, selection of witnesses, and other procedural matters.[39] Further, "[i]n exceptional circumstances, where a witness or exhibit does not become known or available until immediately before the hearing, the DHO may, at her or his discretion, permit the evidence to be presented or may reschedule the hearing to a later time."[40] Following a hearing, a five-member Hearing Panel of students and faculty makes findings of whether the student is responsible for an academic integrity violation.[41] If it finds that a violation occurred, the Panel recommends a sanction to the Provost.[42] The Charter also provides for an appellate process, with the Disciplinary Appellate Officer ("DAO") having exclusive jurisdiction over appeals.[43]

On July 21, 2021, Glickman informed Plaintiff that the hearing was set for August 26, 2021, and that Dr. Daniel Kessler, a Professor of Cell and Developmental Biology, would serve as the DHO.[44] The deadline for the parties' exhibit and witness disclosures was August 13, 2021.[45] On August 12, 2021, Glickman provided OSC's witness and exhibit list to the DHO and Plaintiff.[46] OSC listed twenty-two exhibits, with some having subparts "a," "b," or "c," and three

---

[38] *Id.* ¶ 66; Charter § I.D.4 [Doc. No. 61-2]. Although the copy of the Charter in the summary judgment record has subdivisions that are labeled differently than in the version attached to the University's motion to dismiss [*see* Doc. No. 16-5], the relevant provisions of the two versions are not different in substance. The Court will reference the Charter's subdivisions using the copy provided on summary judgment.

[39] SSMF ¶ 67 [Doc. No. 59-1].

[40] Charter § II.F.3(c) [Doc. No. 61-2].

[41] *Id.* §§ I.D.6, II.F.5.

[42] *Id.* § II.F.5.

[43] *Id.* §§ II.G.1, II.G.2.

[44] SSMF ¶¶ 61-62 [Doc. No. 59-1].

[45] *Id.* ¶ 72.

[46] *Id.* ¶ 73.

witnesses: Professor Tong, A.R., and H.B.[47] Of note, OSC Exhibit 15a/b was labeled as "[s]creenshots of text communication between [Plaintiff] and [A.R.] on May 12, 2021."[48] On August 13, 2021, Plaintiff provided her witness and exhibit list to the DHO and Glickman.[49]

Soon thereafter, the parties sought to amend their exhibit and witness submissions. On August 18, 2021, Plaintiff requested to call a digital forensic expert to testify about the authenticity of certain screenshots and text messages.[50] She urged that an expert witness would clarify that "the screenshots of text messages between the parties in this matter have no value as evidence as they cannot be authenticated, and they can readily be fabricated."[51] The DHO denied the request, reasoning that the Rules of Evidence did not apply, that Plaintiff could question the witnesses about authenticity concerns, and that any such concerns would be resolved by the Hearing Panel's examination of the witnesses' electronic devices.[52] On August 23, 2021, Plaintiff asked if a forensic expert report would be admissible in lieu of live testimony.[53] The DHO responded that he would consider including the expert report in the hearing materials.[54]

On August 24, 2021, two days before the hearing, Glickman emailed the DHO and Plaintiff informing them that she had uploaded a new exhibit (OSC Exhibit 23) to the designated

---

[47] *Id.* ¶¶ 74, 76. On August 23, 2021, Plaintiff sent the DHO an email objecting to OSC Exhibits 14a, 15a/b, and 16 as false and inaccurate. *Id.* ¶ 83. The DHO declined to exclude the exhibits and explained that he was similarly allowing Plaintiff to present certain exhibits notwithstanding OSC's objections to their veracity. *Id.* ¶ 84.

[48] *Id.* ¶ 75.

[49] *Id.* ¶ 77.

[50] *Id.* ¶ 78; 8/18/21 Reddy-Kessler Email [Doc. No. 61-5 at p. 6].

[51] *See* 8/18/21 Reddy-Kessler Email [Doc. No. 61-5 at p. 6].

[52] SSMF ¶¶ 79-80 [Doc. No. 59-1]; 8/20/21 Reddy-Kessler Email [Doc. No. 61-5 at pp. 2-5].

[53] SSMF ¶ 85 [Doc. No. 59-1].

[54] *Id.* ¶ 86.

exhibit-sharing platform.[55] She explained that OSC Exhibit 23 was an excerpt of the text messages between A.R. and Plaintiff that had been disclosed to Plaintiff in OSC Exhibit 15a/b.[56]

That same day, Plaintiff requested a continuance to review the late addition of OSC Exhibit 23 and to obtain more time to gather the expert report that the DHO indicated he would consider including as part of the hearing materials.[57] The DHO denied the continuance.[58] As to OSC Exhibit 23, he explained, "this brief exhibit does not constitute a burden . . . . Please note that OSC has presented additional exhibits, and I have not allowed those because of the late stage of preparation for the hearing, in line with the concern you raise."[59] Addressing Plaintiff's claim that she needed more time to produce an expert report, the DHO wrote:

> [T]o have a forensic analysis initiated at this point is not reasonable. I note that in your request to include an expert witness you stated the witness would "point out the potential for falsified or fraudulent screenshots." You did not indicate that the witness would provide a forensic analysis. In light of the fact that devices will be produced at the hearing, allowing for validation of the exhibits, a forensic analysis of the screenshot records is of limited relevance and value to the hearing process.[60]

The day before the hearing, Plaintiff requested to add an additional witness "D.S." to speak about Plaintiff's character.[61] The DHO, exercising his discretion, granted the request.[62]

The Hearing occurred on August 26, 2021.[63] The Hearing Panel heard testimony from Plaintiff, Professor Tong, H.B., A.R., and D.S.[64] Plaintiff did not dispute that her and A.R.'s Lab

---

[55] *Id.* ¶ 87.

[56] *Id.*; 8/23/21 Glickman Email [Doc. No. 60-16].

[57] SSMF ¶ 89 [Doc. No. 59-1]; Reddy-Kessler Email [Doc. No. 60-15 at pp. 2-3].

[58] SSMF ¶ 90 [Doc. No. 59-1].

[59] *Id.* ¶ 90; 8/24/21 Kessler-Reddy Email [Doc. No. 60-15 at 2].

[60] 8/24/21 Kessler-Reddy Email [Doc. No. 60-15 at 2].

[61] SSMF ¶ 91 [Doc. No. 59-1].

[62] *Id.* ¶ 93.

[63] *Id.* ¶ 94.

[64] *Id.* ¶ 105.

Reports were substantially similar.[65] The Panel found Plaintiff responsible for the academic integrity violation and recommended a one and a half year suspension, a transcript notation during the suspension period, and an apology letter to A.R.[66] The Panel later released a formal report detailing its findings and reiterating that Plaintiff was responsible.[67] Plaintiff indicated in her deposition that she had no reason to believe that the Panel members knew of her formal bias complaint against Professor Tong on June 7, 2021, and Plaintiff further indicated that she did not recall that any Panel members knew of her complaint of bias via email on May 8, 2021.[68] Plaintiff appealed the Panel's decision to the DAO, Dr. Sophia Lee, who affirmed the decision in all respects.[69] Plaintiff had no reason to believe that Dr. Lee was aware of either Plaintiff's formal bias report against Dr. Tong or her informal complaint via email.[70]

### D.      Procedural History

On July 11, 2022, Plaintiff filed the Complaint in this case. She alleged that the University retaliated against her in violation of Title VI of the Civil Rights Act of 1964 in response to her allegations against Professor Tong (Count 1).[71] She also alleged breach of contract on the grounds that the University's management of her disciplinary proceedings violated various policies and agreements, including the Charter (Count 2).[72] Plaintiff initially

---

[65] *Id.* ¶ 106; Hearing Panel Report [Doc. No. 60-18].

[66] SSMF ¶¶ 107-08 [Doc. No. 59-1]; Hearing Panel Report at 6 [Doc. No. 60-18]. These sanctions were later imposed on Plaintiff by the Provost. SSMF ¶ 124 [Doc. No. 59-1].

[67] SSMF ¶ 111 [Doc. No. 59-1]; Hearing Panel Report [Doc. No. 60-18].

[68] SSMF ¶¶ 101-02 [Doc. No. 59-1].

[69] *Id.* ¶¶ 117, 122-23; Decision on Appeal [Doc. No. 60-20].

[70] SSMF ¶¶ 119-20 [Doc. No. 59-1].

[71] Compl. ¶¶ 137-49 [Doc. No. 1].

[72] *Id.* ¶¶ 150-57.

sought to proceed under a pseudonym.[73] The Court denied this request but granted Plaintiff's

separate request that the non-party students be referred to by their initials.[74] The Court later

dismissed Plaintiff's breach of contract claim in part, allowing it to proceed only as to the three

Charter provisions discussed hereinbelow.[75] Following discovery, the University moved for

summary judgment on all remaining claims.[76] The motion is fully briefed and ripe for review.[77]

## II.   LEGAL STANDARD

Summary judgment is appropriate only when the parties' submissions collectively

"show[] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."[78] "The 'purpose of summary judgment is to pierce the pleadings

and to assess the proof in order to see whether there is a genuine need for trial.' "[79] The movant

bears the burden of demonstrating the absence of a genuine dispute of material fact.[80] A fact is

"material" if its proof or disproof could affect the outcome of the legal action, and a dispute of

material fact is "genuine" if the evidence would allow a reasonable factfinder to return a verdict

in favor of the nonmoving party.[81]

In deciding whether claims withstand a motion for summary judgment, the Court must

view all facts in the light most favorable to the nonmoving party and draw all reasonable

---

[73] Mot. Protective Order [Doc. No. 2].

[74] 3/23/23 Order [Doc. No. 20]. The Third Circuit affirmed this ruling on May 6, 2024. *See* Judgment [Doc. No. 27].

[75] 8/22/24 Memorandum Opinion at 9-18 [Doc. No. 32]; 8/22/24 Order [Doc. No. 33].

[76] Def.'s Mot. Summary Judgment ("Def.'s Mot.") [Doc. No. 59].

[77] *See* Pl.'s Opp'n [Doc. No. 60]; Def.'s Reply [Doc. No. 61].

[78] Fed. R. Civ. P. 56(a).

[79] *Rosenberg as Tr. of Douglas Rosenberg 2004 Tr. v. PHL Variable Ins. Co.*, No. 23-1234, 2024 WL 2012486, at *3 n.13 (3d Cir. May 7, 2024) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[80] *Monroe v. Beard*, 536 F.3d 198, 206 (3d Cir. 2008).

[81] *Anderson*, 477 U.S. at 248.

inferences in the nonmoving party's favor.[82] The Court's "role is not to weigh the evidence and assess its veracity."[83] To avert summary judgment, however, "a plaintiff . . . must point to concrete evidence in the record that supports each and every essential element of his case."[84] This affirmative evidence may be "direct or circumstantial" and "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance."[85] "Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment."[86]

## III.   DISCUSSION

### A.   Title VI Retaliation Claim

The University first seeks summary judgment on Plaintiff's claim of retaliation under Title VI of the Civil Rights Act of 1964.[87] To establish a *prima facie* case of retaliation under Title VI, a plaintiff must show (1) that she engaged in a protected activity, (2) that an entity receiving federal funding subjected her to an adverse action contemporaneously with or after the protected activity, and (3) that a causal relationship existed between the protected activity and the adverse action.[88] If the plaintiff offers sufficient evidence to make out a *prima facie* retaliation case, courts follow the *McDonnell Douglas*[89] burden-shifting framework, which

---

[82] *Id.* at 255.

[83] *Clews v. Cnty. of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021).

[84] *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (quoting *Orsatti v. NJ. State Police*, 71 F.3d 480, 484 (3d Cir. 1995)).

[85] *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

[86] *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[87] Def.'s Mot. at 1-4 [Doc. No. 59].

[88] *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 522 (3d Cir. 2011); *see also Katchur v. Thomas Jefferson Univ.*, 354 F. Supp. 3d 655, 668-69 (E.D. Pa. 2019) (citing *Whitfield* and noting that the standard for Title VI retaliation claims is the same as for retaliation claims under Title VII).

[89] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

applies with equal force to Title VI retaliation claims as it does to discrimination or retaliation claims under Title VII.[90] Under this framework, once the plaintiff has adduced evidence to support a *prima facie* case, "the burden shifts to the [defendant] to advance a legitimate, non-retaliatory reason" for the adverse action.[91] If the defendant meets that burden, the plaintiff must, in turn, present evidence exposing the falsity of the defendant's non-retaliatory justification so as to reveal an underlying retaliatory animus.[92]

The University does not deny that Plaintiff engaged in a protected activity by complaining of bias to Professor Tong directly and later filing a formal bias complaint against him.[93] Nor does it dispute that Plaintiff suffered an adverse action when the University imposed a one and a half year suspension.[94] As such, whether Plaintiff has mounted a *prima facie* retaliation case turns on causality, and the Court will concentrate its analysis there.

But before undertaking a causality analysis, the Court must clarify whether Plaintiff's case involves one adverse action or two. In her Complaint, Plaintiff asserted two adverse actions: first, the University's imposition of a one and a half year suspension; and second, Professor Tong's submission of an academic integrity complaint against her on May 10, 2021.[95] As the University recognizes,[96] a strict reading of Plaintiff's Opposition would show that she has

---

[90] *See Moore v. City of Phila.*, 461 F.3d 331, 340-342 (3d Cir. 2006) (applying the *McDonnell Douglas* framework in evaluating whether a Title VII retaliation claim could withstand summary judgment); *Xu Feng v. Univ. of Delaware*, 785 F. App'x 53, 55 (3d Cir. 2019) ("Cases under Title VI are governed by the same framework as those under other federal civil rights laws such as Title VII, which covers employment discrimination claims."); *Williams v. Pa. State Univ.*, No. 23-3180, 2025 WL 971670, at *2 (3d Cir. Apr. 1, 2025) (citing *McDonnell Douglas* as authoritative in the context of a Title VI retaliation claim).

[91] *See Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).

[92] *Id.*

[93] Def.'s Reply at 13 n.6 [Doc. No. 61].

[94] Def.'s Mot. ¶ 15 [Doc. No. 59].

[95] Compl. ¶¶ 140, 142 [Doc. No. 1].

[96] Def.'s Reply at 12 n.4 [Doc. No. 61].

abandoned the first theory by constraining her adverse-action argument to the contention that she "Suffered an Adverse Action When She Was Suspended."[97] However, Plaintiff's causality argument implies, and assumes, that Professor Tong's complaint against her was also an adverse action.[98] Further, it is the University's burden to prove the absence of a triable issue, and Plaintiff initially averred that the filing of the academic integrity complaint against her amounted to an adverse action. The Court will construe that Plaintiff still considers the academic integrity complaint as an adverse action, and thus the Court proceeds to analyze causality for each of the two adverse actions.

### 1.    *The Hearing Panel's Findings and Subsequent Suspension*

The University argues that Plaintiff cannot show a causal link between her complaints of bias and the outcome of her disciplinary hearing.[99] The University specifically stresses the absence of evidence that the decisionmakers who found Plaintiff responsible and contributed to her suspension knew of Plaintiff's allegations of bias against Professor Tong.[100] Plaintiff disagrees, arguing that a jury could infer that those decisionmakers acquired such knowledge based on Plaintiff's meeting with certain University officials about her formal bias complaint.[101]

The Court agrees with the University. The individuals who contributed to finding Plaintiff responsible and imposing the suspension are the Hearing Panel members and the DAO.[102] Based on testimony gathered at Plaintiff's deposition, the parties stipulated that Plaintiff

---

[97] Pl.'s Opp'n at 7 [Doc. No. 60].

[98] *See id.* at 8-9.

[99] Def.'s Reply at 13-16 [Doc. No. 61].

[100] *Id.*

[101] Pl.'s Opp'n at 10-11 [Doc. No. 60].

[102] The Charter technically provides that the Hearing Panel's recommendation of a sanction does not take effect until imposed by the Provost. Charter § II.F.5(e) [Doc. No. 61-2]. Plaintiff has not argued that the Provost's actions are an issue in this case.

13

"had no reason to believe" that any of the five Hearing Panel members were familiar with her June 7, 2021 report of bias against Professor Tong.[103] The parties likewise stipulated that Plaintiff "had no recollection" of whether any of the Hearing Panel members knew of her May 8, 2021 email to Professor Tong alleging that he may have been unknowingly biased.[104] The stipulated facts similarly show that Plaintiff had no reason to believe, or otherwise did not recall, that the DAO was familiar with Plaintiff's June 7, 2021 report or her May 8, 2021 email.[105]

Without reason to believe that the decisionmakers knew of her complaints against Professor Tong, Plaintiff relies on the assumption that because she met with the University's Vice Provost of University Life and the Director of Women's Center, her allegations against Professor Tong were relayed to the decisionmakers.[106] But she does not explain how, or why, a report against a faculty member would be disclosed at an Office of Student Conduct proceeding except in saying, without record citation, that the Vice Provost and the Director of Women's Center were mandatory reporters.[107] In drawing all reasonable inferences in Plaintiff's favor, the Court must assume others in University Life or the Women's Center could have been privy to Plaintiff's formal bias report. But the record evidence does not support a chain of inferences that the formal bias complaint would have been disclosed across University departments.[108]

Further, even if the evidence suggested that the Hearing Panel or DAO knew of the allegations against Professor Tong, Plaintiff's only evidence of a retaliatory motive is the

---

[103] SSMF ¶ 101 [Doc. No. 59-1].

[104] *Id.* ¶ 102.

[105] *Id.* ¶¶ 119-20.

[106] Pl.'s Opp'n at 10 [Doc. No. 60].

[107] *Id.*

[108] *See Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment. Inferences must flow directly from admissible evidence." (quoting *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n.12 (3d Cir. 1990))).

suspension's length.[109] The length of the suspension does not directly convey the Hearing Panel's thought process. To the contrary, the Panel's reasoning is discernible only through the Hearing Panel Report, wherein the Panel explained that, following OSC precedent, a one and a half year suspension was justified based on the finding that Plaintiff did not exhibit contrition and that she attempted to fabricate evidence to inculpate another student.[110]

Because, viewing the evidence in the light most favorable to Plaintiff, no reasonable juror could find that the Hearing Panel or DAO knew of Plaintiff's bias complaints,[111] much less relied improperly upon them, summary judgment is warranted on the Title VI retaliation claim as it concerns the outcome of the disciplinary hearing.

### 2.    *The Academic Integrity Complaint*

The parties dispute whether Professor Tong's academic integrity complaint of May 10, 2021, was motivated by Plaintiff's accusations of bias so as to amount to retaliation. As Plaintiff did not file the formal bias report against Professor Tong until June, the only protected action relevant to the Court's assessment of causality is her May 8, 2021 email to Professor Tong stating, "Your punitiveness towards me only sets me up for more issues. You may be unknowingly biasing yourself against me."[112]

Plaintiff first submits that there is a causal link between the May 8 email and Professor Tong's filing of the academic integrity complaint because of the proximity in time between the

---

[109] Pl.'s Opp'n at 10-11 [Doc. No. 60].

[110] Hearing Panel Report at 6 [Doc. No. 60-18]. The DAO affirmed the one and a half year suspension because, although the sanction was harsher than in prior plagiarism cases, it was reasonable in light of relevant precedent and the aggravating circumstances found by the Panel. *See* Decision on Appeal at 8-10 [Doc. No. 60-20].

[111] *Cf. Moore*, 461 F.3d at 351-52 ("It is not reasonable for a factfinder to infer that [a] [defendant's] reaction was motivated by an intent to retaliate for conduct of which the [defendant's] decision maker was not aware.").

[112] 5/8/21 Reddy-Tong Email [Doc. No. 60-6].

two events.[113] According to Third Circuit precedent, a plaintiff may "rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him."[114] "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection."[115]

In deciding whether temporal proximity, by itself, is enough to show causation for purposes of a *prima facie* case at the summary judgment stage, the Court must focus "on how proximate the events actually were, and the context in which the issue came before [the Court]."[116] Whereas a two-day interval between protected conduct and an adverse action sufficed, on its own, to establish causation in *Jalil v. Avdel Corporation*,[117] intervals of anywhere between a few weeks to nineteen months were insufficient in other cases.[118] If a plaintiff cannot show a *prima facie* causal link through closeness in time, alone, he may rely on other facts to demonstrate that his protected conduct was the likely reason for the adverse action, such as the defendant's "inconsistent reasons"[119] for taking the adverse action, or a "pattern of

---

[113] Pl.'s Opp'n at 8-9 [Doc. No. 60].

[114] *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)).

[115] *Id.*

[116] *Farrell*, 206 F.3d at 279; *see also Starnes v. Butler Cnty. Court of Common Pleas 50th Judicial Dist.*, 971 F.3d 416, 430 (3d Cir. 2020) ("A causal link may be established by showing 'unusually suggestive temporal proximity.' " (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007))).

[117] *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (facing a motion for summary judgment, the plaintiff created a factual dispute as to causation by showing he was discharged two days after his employer was notified of his EEOC complaint); *see also Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 242-43 (3d Cir. 2016) (an interval of mere days between plaintiffs' objections to an internal policy and their demotion created a triable issue on causation).

[118] *Carvahlo-Grevious v. Delaware State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) (plaintiff's filing of a human resources complaint on April 14, weeks before learning on May 3 that her term as chairperson would end prematurely, did not result in an unusually suggestive temporal proximity); *Krouse*, 126 F.3d at 503 (same conclusion where nineteen months elapsed).

[119] *Farrell*, 206 F.3d at 281.

antagonism"[120] between the parties. To be clear, however, these methods of demonstrating the requisite causal connection are not exclusive.[121]

Here, similarly to *Jalil* and *Fraternal Order of Police*, Plaintiff presented evidence that Professor Tong reported her for an academic integrity violation two days after she accused him of being unknowingly biased.[122] In her declaration, Plaintiff also states that he applied a stricter protocol for extensions to her than to white male classmates like H.B, who could submit work any time before the end of the semester without penalty.[123] Viewing this evidence in the light most favorable to Plaintiff, the passage of just two days between her claim of bias and Professor Tong's filing of the complaint is enough to fulfill her *prima facie* burden on causality.

As a result, the burden shifts to the University to articulate a legitimate, non-retaliatory reason for Professor Tong's academic integrity complaint. The University has clearly met this burden by pointing to undisputed facts, backed by record evidence, showing that the complaint was based upon a genuine suspicion of academic misconduct.[124]

The University's justification shifts the burden back to Plaintiff to adduce evidence indicating that the justification is mere pretext for a retaliatory action.[125] Plaintiff must identify evidence demonstrating " 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' from which a reasonable juror could conclude that the [University's] explanation

---

[120] *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

[121] *Id.*

[122] 5/8/21 Reddy-Tong Email [Doc. No. 60-6]; Receipt of Academic Integrity Compl. [Doc. No. 60-7].

[123] Pl.'s Declaration ¶¶ 10-11 [Doc. No. 60-1].

[124] *See* SSMF ¶¶ 39-56 [Doc. No. 59-1].

[125] *See Carvalho-Grevious*, 851 F.3d at 257.

is 'unworthy of credence, and hence infer that [it] did not act for the asserted non-retaliatory reasons.' "[126]

Plaintiff has not met this burden. First, contrary to her contentions, the temporal proximity of the adverse action does not allay the University's explanation. As cited by the University, the undisputed facts recount the following. On May 10, 2021, the day the academic integrity complaint was filed, it was a TA—not Professor Tong—who found significant overlap between Plaintiff and A.R.'s Lab Reports.[127] The TA relayed this concern to Professor Tong via email, prompting Professor Tong to confirm the similarities using the computer program "Turnitin."[128] Then, on the same day that he learned of the suspected misconduct, Professor Tong promptly filed the academic integrity complaint, receiving a receipt at 11:44 p.m.[129] In addition to Plaintiff, the academic integrity report named A.R., who had not raised any complaints against Professor Tong.[130] Plaintiff, for her part, did not dispute that the Lab Reports were substantially similar at the hearing.[131] Nor does she contest that resemblance in her briefing. As the record indicates, the two Lab Reports' drew noteworthy suspicion not just because of similar or identical text and figures but because of an irregular "NMR H Data" value which both students typed as "2.1 ppm" instead of the correct value of "7.4 ppm."[132] In sum, the undisputed facts are replete with information showing that the academic integrity complaint was genuine and that the TA's discovery of potential plagiarism was an intervening event that "broke the

---

[126] *Id.* at 262 (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 199 (3d Cir. 2015) (alteration omitted)).

[127] SSMF ¶ 43 [Doc. No. 59-1].

[128] *Id.* ¶ 44.

[129] *Id.* ¶ 46; Receipt of Academic Integrity Compl. [Doc. No. 60-7].

[130] SSMF ¶¶ 46-47 [Doc. No. 59-1].

[131] *Id.* ¶ 106.

[132] Receipt of Academic Integrity Compl. [Doc. No. 60-7].

18

causal link that could otherwise be inferred from temporal proximity" between the protected activity and adverse action.[133]

Second, Plaintiff's generalized concern that white male students received more lenient treatment, even if true, does not dispel the undisputed facts showing that the academic integrity complaint was genuine. For one, despite arguing that H.B., a white male, received more favorable treatment on extensions, Plaintiff offers no evidence that H.B. had that preferential treatment on account of his race or gender.[134] By extension, there is no record evidence to suggest that Professor Tong had any improper animus toward Plaintiff. Moreover, to the extent Plaintiff scrutinizes that Professor Tong's complaint was against her and A.R. but not H.B., that argument collides with the undisputed fact that it was only her and A.R.'s Lab Reports that the TA found substantially similar. Although, in retrospect, H.B. played a role in the communication between A.R. and Plaintiff, that information was unavailable to Professor Tong when he filed the complaint, and H.B. was eventually sent a notice letter when his role was discovered. Accordingly, Plaintiff's concerns about disparate treatment do not cast doubt on the legitimacy of the academic integrity complaint.

For the foregoing reasons, even viewing the facts and evidence in Plaintiff's favor, no reasonable juror could find that Professor Tong's submission of an academic integrity complaint was pretextual. The University is entitled to summary judgment on Plaintiff's Title VI retaliation claim as it concerns Professor Tong's academic integrity complaint.

---

[133] *Houston v. Dialysis Clinic, Inc.*, No. 13-4461, 2015 WL 3935104, at *11 (D.N.J. June 26, 2015); *see also Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (a short interval between a protected activity and an adverse action did not establish causation where intervening causes arose).

[134] *See* Pl.'s Declaration ¶ 11 [Doc. No. 60-1]; Pl.'s Opp'n at 9-10 [Doc. No. 60].

### B.  Breach of Contract Claim

To make out a breach of contract claim under Pennsylvania law, a plaintiff must show "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."[135] As an initial matter, Plaintiff has established that a contract existed between the parties.[136] In seeking summary judgment, the University accordingly argues that there is insufficient evidence of breach.[137]

When interpreting a contract to determine whether a breach has occurred, "[t]he paramount goal . . . is to ascertain and give effect to the intent of the parties."[138] "When the words of a contract are clear and unambiguous, the intent of the parties must be ascertained from the language employed in the contract, which shall be given its commonly accepted and plain meaning."[139]

Plaintiff argues that the University breached the procedural obligations of the Charter in two ways. First, she argues that the DHO violated the Charter by admitting OSC Exhibit 23 two

---

[135] *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999) (alteration omitted)). The parties do not dispute that Pennsylvania law applies. Def.'s Reply at 18 & n.10 [Doc. No. 61]; Pl.'s Opp'n at 11 [Doc. No. 60]. With this Court exercising supplemental jurisdiction and Pennsylvania as the forum state, the governing law is decided by which state has the greatest interest in the matter based on its contacts with the contract. *See Sys. Operations, Inc. v. Scientific Games Dev. Corp,* 555 F.2d 1131, 1136 (3d Cir. 1977); *Travelers Prop. Casualty Co. v. Chubb Custom Ins. Co.*, 864 F. Supp. 2d. 301, 308 (E.D. Pa. 2012). Pennsylvania has the most substantial contacts with this matter, as the facts relevant to performance under the Charter occurred in Pennsylvania and both parties either resided or had their principal place of business in Pennsylvania at all pertinent times. *See generally* SSMF [Doc. No. 59-1].

[136] "The relationship between a private educational institution and an enrolled student is contractual in nature." *Doe v. The Trustees of the Univ. of Pa.,* 270 F. Supp. 3d 799, 810 (E.D. Pa. 2017) (quoting *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999) (alteration omitted)). That contract encompasses "any 'agreement between the parties concerning disciplinary procedures, contained within a portion of the student handbook.' " *Id.* (quoting *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super Ct. 2007)). It is immaterial that the procedures at issue in this case were in a disciplinary charter rather than a student handbook. *See Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 573 A.2d 575, 510 (Pa. Super Ct. (1990)) ("[S]tudents who are being disciplined are entitled only to those procedural safeguards which the school specifically provides.").

[137] Def.'s Mot. ¶ 21 [Doc. No. 59].

[138] *Meeting House Lane, Ltd. v. Melso*, 628 A.2d 854, 857 (Pa. Super. Ct. 1993) (quoting *PBS Coals, Inc. v. Barnham Coal Co.*, 558 A.2d 562, 564 (1989) (superseded by statute on unrelated grounds)).

[139] *TruServ Corp. v. Morgan's Tool & Supply Co.*, 39 A.3d 253, 260 (2012).

days before the hearing and by declining to grant a continuance after this last-minute addition.[140]

Second, she argues that the DHO breached the Charter by declining to allow live expert

testimony and failing to grant a continuance to provide Plaintiff more time to submit a written

expert report.[141] The University submits that Plaintiff has not produced sufficient evidence to

raise a genuine dispute as to either issue.[142]

The Charter contains three provisions in its subheading on Pre-Hearing Exchanges and

Testimony that are pertinent to Plaintiff's breach of contract claims. These provisions,

corresponding to subsections 3(a), 3(c), and 3(d), provide:

> *Pre-Hearing Exchanges and Testimony*
>
> a. Within a reasonable time before the hearing or any other time frame specified by the DHO, the OSC and the respondent(s) will exchange among themselves and with the DHO copies of all exhibits to be presented, the names of witnesses to be called, and a brief summary of the substance of testimony expected to be presented to the Hearing Panel.
>
> . . . .
>
> c. In exceptional circumstances, when a witness or exhibit does not become known or available until immediately before the hearing, the DHO may, at her or his discretion, permit the evidence to be presented or may reschedule the hearing to a later time.
>
> d. If a respondent or the OSC anticipates that a key witness will be unavailable for a hearing, they may ask the DHO to preserve the testimony of the witness on tape and present it as evidence at the hearing. The OSC and the respondent(s) must be notified in advance of the date, time and place of the taping. All parties who would be permitted to question such a witness at a hearing may question the witness at the taping.[143]

---

[140] Pl.'s Opp'n at 11-12 [Doc. No. 60].

[141] *Id.* at 12-13.

[142] Def.'s Reply at 18-25 [Doc. No. 61].

[143] Charter § II.F.3 [Doc. No. 61-2].

1.    *The Addition of OSC Exhibit 23*

Plaintiff first contends that the disclosure of OSC Exhibit 23 two days before the hearing was not "within a reasonable time before the hearing" as required by section II.F.3(a) of the Charter.[144] It is undisputed that the initial deadline for exhibit exchanges was August 13, 2021.[145] However, even viewing all evidence to favor Plaintiff, OSC Exhibit 23 did not add new evidence to what the University had already disclosed by the deadline. Indeed, on August 12, the University disclosed twenty-two exhibits, including OSC Exhibit 15a, which featured eight images of text messages sent between A.R. and either Plaintiff or H.B.[146] OSC Exhibit 23 merely contained a subset of those eight images, featuring the following text exchange that had already been disclosed to Plaintiff on August 12:

PLAINTIFF: "Can we make sure our stories are straight?"

PLAINTIFF: "We worked on the lab together and we did Chem draw together."

A.R.: "Sorry-I am no longer doing this. We did not work on the report together."[147]

In fact, Plaintiff had notice of these messages not just through the August 12, 2021 disclosure but also through the July 9, 2021 Charge Letter. Because Plaintiff had already been provided with the evidence contained in OSC Exhibit 23, which amounted to just a few lines of text, no reasonable juror could find that OSC's late addition of OSC Exhibit 23 was unreasonable under section II.F.3(a). Nor could any such juror conclude that the DHO abused his discretion under section II.F.3(c) by admitting OSC Exhibit 23 and denying a continuance. Indeed, emails between the DHO and Plaintiff show that the DHO had denied OSC's other last-minute requests,

[144] Pl.'s Opp'n at 12 [Doc. No. 60].

[145] SSMF ¶ 72 [Doc. No. 59-1].

[146] OSC Exhibit 15a [Doc. No. 61-4]; Declaration of Patrick F. Nugent ¶ 5 [Doc. No. 61-1].

[147] OSC Exhibit 23 [Doc. No. 61-3]; Declaration of Patrick F. Nugent ¶ 4 [Doc. No. 61-1].

which concerned material that had not previously been disclosed.[148] The Court will grant the University summary judgment on the breach of contract issues that relate to the late introduction of OSC Exhibit 23.

### 2.      *Plaintiff's Interest in Presenting Expert Testimony*

Plaintiff next contends that the DHO violated sections II.F.3(c) and II.F.3(d) of the Charter by neither accepting live expert testimony on the issue of falsification of exhibits nor granting a continuance to allow her to submit a written expert report.[149]

The Court first examines the DHO's decision on August 20, 2021, barring Plaintiff from presenting live expert testimony. On August 18, 2021, with concern that some of OSC's exhibits had been altered or falsified, Plaintiff requested to introduce expert testimony from a former Philadelphia District Attorney's Office detective with expertise in digital forensics.[150] She anticipated that the expert would "testify that screenshots of text messages between the parties in this matter have no value as evidence as they cannot be authenticated and they can readily be fabricated."[151] Her request came five days after the deadline to disclose her witness list.[152] Viewing the facts in her favor, however, the Court must draw the inference that she could not assess the probative value of expert testimony until receiving OSC's exhibits on August 12, 2021.

But the Court cannot draw the additional inference that the DHO's decision to deny expert testimony was an abuse of discretion. No provision in the Charter gives students the right

---

[148] *See* SSMF ¶ 90 [Doc. No. 59-1]; 8/24/21 Kessler-Reddy Email [Doc. No. 60-15 at p. 2].

[149] Pl.'s Opp'n at 12-13 [Doc. No. 60].

[150] 8/18/21 Reddy-Keller Email [Doc. No. 61-5 at p.6].

[151] *Id.*

[152] *See* SSMF ¶ 72 [Doc. No. 59-1].

to call experts. Rather, as the DHO noted, University disciplinary hearings "are not constrained by technical rules of procedure, evidence, or judicial formality" but are rather "designed to encourage open discussion among the participants that promotes the Hearing Panel's understanding of the facts, the individuals involved, the circumstances under which the incident occurred, the nature of the conduct, and the attributes and experience of those involved."[153] Since the Charter is silent on expert testimony and envisions a more targeted process centered on the individuals involved, no reasonable juror could find that the refusal of live expert testimony constituted breach. As a corollary, no such juror could find a breach of section II.F.3(d), permitting parties to "ask the DHO to preserve the testimony" of a "key witness" via tape based on unavailability,[154] since the Charter did not contemplate hearings laden with expert testimony and since Plaintiff never attempted to invoke section II.F.3(d), regardless.

Turning to the DHO's denial of a continuance, a similar analysis obtains. Apart from her concerns regarding OSC Exhibit 23, Plaintiff requested a continuance two days before the hearing based on her need for time to gather a written expert report.[155] As is undisputed, Plaintiff sought a forensic report in lieu of live expert testimony because the DHO told Plaintiff that "he would consider including the forensic report in the hearing materials if she would like to submit it."[156] But, for the reasons stated above, the DHO was not required to allow expert testimony

---

[153] Disciplinary Charter § II.F.4(a); 8/20/21 Keller-Reddy Email [Doc. No. 61-5 at p. 4].

[154] Disciplinary Charter § II.F.3(d).

[155] 8/24/21 Reddy-Kessler Email [Doc. No. 60-15 at pp. 2-3].

[156] SSMF ¶ 86 [Doc. No. 59-1]. From the DHO's email to Plaintiff on August 24, 2021, it appears that the contents of the forensic report would have differed from the live testimony Plaintiff initially requested. Whereas Plaintiff said that the expert's live testimony would convey that screenshots can be easily falsified, the forensic analysis may have involved an examination of certain features in the screenshot exhibits themselves. At any rate, the DHO found neither mode of expert analysis to be sufficiently impactful for admission, given other evidence tending to inculpate Plaintiff and the Hearing Panel's opportunity to examine the relevant devices to determine if the screenshots had been manipulated. *See* Kessler Dep. at 29 [Doc. No. 60-21].

under the terms of the Charter. Moreover, decisions on continuances were a matter of the DHO's discretion, with the Charter stating, "In exceptional circumstances . . . the DHO may, at her or his discretion . . . reschedule the hearing to a later time."[157] Consistent with a backdrop where "courts have been very reluctant to interfere with college proceedings concerning internal discipline," the Court finds that the DHO exercised reasonable discretion.[158] He reasoned that forensic testimony would be of limited relevance, first, because the parties agreed that the Panel would inspect the student's devices at the hearing to assess whether any screenshots had been manipulated,[159] and second, because the screenshots were just a subset of the evidence tending to show that Plaintiff was responsible for the violation.[160] Although the DHO could have reached alternative decisions regarding the need for expert testimony or a continuance, he did not exceed the bounds of his discretion by choosing not to.[161] The Court will grant summary judgment to the University on the breach of contract issue as it relates to the DHO's denial of expert testimony and of a continuance.

## IV.   CONCLUSION

For the reasons set forth above, the Court will grant the University's motion for summary judgment in full. An order will follow.

---

[157] Disciplinary Charter § II.F.3(c).

[158] *Schulman v. Franklin & Marshall Coll.*, 538 A.2d 49, 52 (Pa. Super. Ct. 1988).

[159] 8/24/21 Kessler-Reddy Email [Doc. No. 60-15 at pp. 2-3].

[160] 8/22/21 Kessler-Reddy Email [Doc. No. 61-5 at p. 2]; Kessler Dep. at 29 [Doc. No. 60-21].

[161] The DHO later exercised his discretion under section II.F.3(c) in Plaintiff's favor by allowing her to present testimony from a character witness, D.S., whom Plaintiff identified one day before the hearing. SSMF ¶ 91 [Doc. No. 59-1].